**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Stanford CHAMPION, Gene Slusser, Eldon L. Morgan, Jr., Lester Spainhoward, Jr., Defendants-Appellants.**

No. 85–5693.

United States Court of Appeals,
Eleventh Circuit.

April 6, 1987.

Charles G. White, Miami, Fla., for Champion

George dePozsgay, Howard, Brawner, Lovett & dePozsgay, Miami, Fla., for Slusser.

Linda L. Carroll, Miami, Fla., for Morgan.

Fred A. Schwartz, Entin, Schwartz, Barbakoff & Schwartz, Ron A. Dion, Miami, Fla., for Spainhoward.

Leon B. Kellner, U.S. Atty., Richard Harris, David Leiwant, Sonia O'Donnell, Asst. U.S. Attys., Miami, Fla., for the U.S.

Before KRAVITCH and HATCHETT, Circuit Judges, and MORGAN, Senior Circuit Judge.

KRAVITCH, Circuit Judge:

A large marijuana importation conspiracy that spanned more than four years and allegedly involved at least twenty attempts to transport marijuana by small aircraft from Jamaica into south Florida forms the basis of this appeal. Some of these alleged "loads" were charged, others were not. The "hub" of the conspiracy was appellant Stanford Champion (Stan) who allegedly worked with the nineteen indicted codefendants, and other unindicted individuals, including several government's witnesses, among whom were two of Stan's brothers, to accomplish his drug dealing aspirations.

Stan was convicted of twenty-two of the thirty-five counts in the indictment. Count 1 charged that from an unknown date prior to December 1979 and continuing through September 1984, Stan and his codefendants "did knowingly and intentionally combine, conspire, confederate and agree with each other and with persons known and unknown to the Grand Jury to commit an offense against the United States" in violation of 21 U.S.C. §§ 952(a) and 960(a)(1). The purpose and object of this alleged conspiracy was to import marijuana into the United States, in violation of 21 U.S.C. § 963. Stan was also convicted of several substantive counts of importing marijuana into the United States in violation of 21 U.S.C. §§ 952(a) and 960(a)(1) and 18 U.S.C. § 2. These importation convictions included: August 2, 1980, in Glades County, Florida (Count 2); May 5, 1982, in Glades County, Florida (Count 10); October 6, 1982, in Highlands County, Florida (Count 12); April-May 1981 in Dade County, Florida (Count 18); June 23, 1982, in Dade and St. Lucie Counties, Florida (Count 20); July 5, 1982, in Dade and St. Lucie Counties, Florida (Count 22); December 11, 1982, in Dade County, Florida (Count 26); July 10, 1983, in Dade County, Florida (Count 28); and October 8, 1983, in Dade County, Florida (Count 30). In addition, Stan was convicted of the substantive offense of possession of marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 on each date upon which he was convicted of importation (Counts 3, 11, 13, 19, 21, 23, 27, 29, and 31). Finally, Stan was convicted of three counts of using a telephone to facilitate the commission of the felonies of conspiracy to import marijuana into the United States and conspiracy to possess marijuana with intent to distribute, in violation of 21 U.S.C. § 843(b) (Counts 32, 33, and 34). Stan was sentenced to a total of thirteen years in prison followed by a five year special parole term and a $15,000 fine.

Appellants Eugene Slusser, Lester Spainhoward, and Eldon Levi Morgan all were convicted of the conspiracy count (Count 1). In addition, appellant Slusser was convicted of the April-May 1981 importation and possession with intent to distribute counts (Counts 18 and 19).[1] Slusser was sen-

---

1. Several other defendants who were convicted on various counts are not parties to this appeal.

Defendants Ron Harrison and John Craft were convicted on Count 1. Defendant Andrew

tenced to twenty-four months imprisonment followed by two years special parole to run consecutively with three years probation. Spainhoward was sentenced to twenty-two months imprisonment. Morgan was sentenced to five years imprisonment, but the court suspended part of the sentence and ordered, pursuant to 18 U.S.C. § 3651, that Morgan serve six months in prison followed by three years probation and a $1000 fine.

A detailed discussion of the lengthy facts of this case is necessary because many of the issues on appeal concern prejudicial variances between the indictment and proof at trial. Accordingly, we discuss evidence from the record as to each of the attempted marijuana loads and the participants in each incident.

## I. BACKGROUND

The alleged conspiracy began in December 1979, at a meeting between Stan and his brother Bennie Champion (Bennie) at the Plaza Pub[2], a liquor lounge, near Homestead, Florida. Previously, Stan had loaned Bennie $1300 which Bennie used for travel to Jamaica to meet marijuana suppliers in an unsuccessful attempt to arrange a drug deal. After some general conversation about selling marijuana, Stan suggested that he might forgive Bennie's debt if Bennie agreed to work with Stan to import marijuana from Jamaica into the United States. Bennie had met a Jamaican marijuana supplier named Roland who would be willing to supply the marijuana; all that Stan and Bennie needed was an airplane and a pilot.

## A. THE MARCH 1980 UNSUCCESSFUL LOAD

Stan located a Piper Aztec aircraft and a pilot named Ronald Haig. Stan arranged to pick up approximately 600 pounds of marijuana in Jamaica and Bennie agreed to serve as copilot on the flight for $15,000.[3]

Haig and Bennie were to land at an airstrip south of Homestead called the "Road to Nowhere." Stan had contacted Frank Basso, Walter Graham, Teddie Merritt and David Beech to off-load the marijuana.

Haig and Bennie flew to Jamaica, where several Jamaicans helped them load the marijuana onto the aircraft. On their return flight, Bennie became excited and let one of the fuel pumps run out of fuel. As a results, the engines quit and Haig was forced to land the plane in the water somewhere east of Andros Island. The aircraft sank in about sixty seconds and Haig and Bennie were left bobbing in the ocean for approximately thirty or forty-five minutes without life rafts or life jackets. Eventually, they were picked up by two Bahamians in a boat.

Bennie called Stan at the Plaza Pub and informed him of what had happened. Stan sent someone to fly them back to Homestead. Stan accused Bennie of stealing the marijuana.

## B. THE APRIL 1980 UNSUCCESSFUL LOAD

Bennie learned that Earl Hauk would rent a twin engine D-18 Beechcraft aircraft to them for $75,000. Stan borrowed $20,000 for the down payment and agreed to rent the plane if the owners would install special fuel tanks to accommodate a long trip. Hauk's agent arranged for Tommy Kentz to serve as pilot for the load. Kentz and Stan inspected several airstrips in the Homestead area and eventually located one that was satisfactory.

Kentz and Bennie flew to Jamaica but the 3200 pounds of marijuana to be flown in this load was not yet packaged when they arrived. Bennie went with the Jamaicans to help them package it. On their way to the airport, however, Bennie and the Jamaicans were stopped by a police roadblock. Jamaican police confiscated the

---

Chuck was convicted on Counts 1, 20, 21, 22, 23, 24, and 25. Defendant Jerry Delarm was convicted on Counts 1, 2, and 3. Defendant Jeffery Powell was convicted on Counts 1, 26, and 27.

**2.** Stan was part owner of the Plaza Pub.

**3.** Bennie's duties were to include pumping extra fuel from barrels inside the plane into the wing tanks and to make certain that the deal went smoothly.

marijuana and arrested Bennie. The police later released Bennie for $250, but neither Bennie nor Stan could raise the $3200 necessary to buy the marijuana back from the Jamaican police. Bennie and Kentz returned to the United States.

## C. THE APRIL 1980 SUCCESSFUL LOAD

Upon arriving in the United States, Bennie and Kentz were called by Stan and told to return to Jamaica because Stan had arranged for another load. Bennie and Kentz took a commercial flight to Jamaica where they were met by David Ambrit, a marijuana supplier.

A few days later, Bennie and Kentz went to an airport in Jamaica where Ambrit had arranged for an aircraft and a load of marijuana. Bennie stole some gas for the airplane and Ambrit arrived a few hours later with the marijuana. Several Jamaican military policemen assisted Ambrit in loading the marijuana onto the plane. Bennie and Kentz took off for the United States.

Kentz got lost attempting to find the landing strip that Stan had shown him near Lake Okeechobee.[4] The aircraft was low on fuel and, given Bennie's recently developed adversity to water landings, they decided to land at Ft. Lauderdale International Airport. After landing, they locked the aircraft in the hangar and took a taxi to a motel.

After unsuccessfully attempting to contact Stan, Basso, and Graham, Bennie finally reached an individual named Dick who lived near Lake Okeechobee and arranged to off-load the marijuana into pickup trucks sometime after dark.

Bennie followed the trucks to a trailer house near Lake Okeechobee where Stan, Basso, Graham, Gene Slusser, and two deputy sheriffs were waiting.[5] They weighed the marijuana and found that there was less than 1600 pounds instead of the 1900 pounds that was supposedly loaded on the

plane. Bennie was accused of stealing part of the load.

Slusser and the deputies were to receive one half of the load for providing an airstrip and security out of which they were to pay Ambrit for supplying the marijuana. After Stan helped Ambrit collect from Slusser, Ambrit agreed to allow Stan and Bennie to deal directly with him as Slusser had done.

## D. THE JULY 1980 SUCCESSFUL LOAD

Stan learned from Ambrit that a Jamaican airport manager named Lazarus had two planes that had been confiscated by the Jamaican police in prior drug deals. Lazarus and Ambrit offered to allow Bennie and Stan to steal the planes in exchange for a payment after the planes were used to bring marijuana into the United States.

Bennie and two pilots, Jerry Delarm and Martin Cooper, both recruited by Stan, traveled to Jamaica on a commercial flight. Bennie supervised the repair of the aircraft and telephoned Stan to notify him of necessary parts for the repairs.

Ambrit had prepared almost 6000 pounds of marijuana for transport in the two aircraft. Slusser agreed to allow the planes to land at an airstrip near Lake Okeechobee called "Six Mile Runway," and to provide ground security in exchange for 700 pounds of marijuana.

The night before the planes were to leave Jamaica, Delarm disappeared, leaving Cooper as the only pilot. Ambrit and the Jamaican military officials loaded one of the planes and Cooper piloted the aircraft out of Jamaica with Bennie serving as his copilot.

Upon attempting to land at the "Six Mile Runway," the plane struck a mudhole and crashed. Aviation fuel was leaking from various points on the plane and Bennie and Cooper were pinned against the instrument

---

4. Stan told Bennie that Slusser had provided the airstrip and security for the airstrip.

5. The record indicates that Slusser was sometimes called "Sheriff." Stan told Bennie that the "Sheriff" and the two deputies controlled fifteen to twenty airstrips in the county.

panels because the marijuana bales had shifted forward. Despite the fire dangers presented, Stan ignored their calls for help and yelled to Merritt, Graham and Basso to unload the marijuana first. Bennie and Cooper were extracated from the wreckage after all the marijuana was removed.

The group transported the marijuana to the same trailer used in the previous successful load. The deputies were given seventy pounds of marijuana. The remainder was transported to David Beech's home in Homestead where Graham and Basso agreed to distribute all marijuana that Stan could import. Although Slusser offered to blow up the wrecked plane, this became unnecessary when the aircraft was struck by lightning.

### E. THE AUGUST 1980 SUCCESSFUL LOAD

Jerry Laughingwell in Texas agreed to rent an aircraft to Bennie and Cooper for $75,000. When Cooper declined to fly the next load from Jamaica because he felt the plane had insufficient fuel capacity, Delarm, who had reappeared, agreed to pilot the flight. Stan decided to avoid the need to pay Slusser by using one of the airstrips Slusser had shown him without notifying Slusser that he was doing so. Stan selected an airstrip on an Indian reservation near Lake Okeechobee.

As the fully-loaded plane was landing at the designated airstrip, Bennie failed to blockade the south entrance to the airstrip and a person driving a jeep entered the area. When the person refused Bennie's offer of $5000 in exchange for his silence, Bennie, Stan, Basso, Beech, Merritt and one other person off-loaded the aircraft quickly in anticipation that the police would arrive soon. Ambrit exited the plane with all the flight maps, and Delarm immediately took off in the plane. The pickup trucks carrying the marijuana proceeded to Beech's house in Homestead. Bennie went to the Clewiston Airport where Delarm was to land the plane.

Delarm flew to the other side of Lake Okeechobee and landed at Pahokee Airport in order to refuel. In landing, Delarm cut off the landing pattern of Palm Beach County Deputy Sheriff Mark Wetherington. On the ground, Wetherington observed marijuana residue through the open door in Delarm's aircraft when he went to question Delarm. He arrested Delarm and seized the aircraft. Bennie and Stan got Hauk, "the bail bondsman," to post bond for Delarm.

### F. THE AUGUST 1980 UNSUCCESSFUL LOAD

In exchange for their assistance in retrieving his seized plane, Laughingwell offered to allow Bennie and Stan to use a 402 Titan aircraft to run another load from Jamaica. Stan arranged for Basso, Graham, Beech and Merritt to serve as the ground crew at an airstrip west of Lake Okeechobee. Delarm was to pilot the aircraft with Billy Bishop as his copilot.

Ambrit notified Bennie that the aircraft left Jamaica twelve hours ahead of schedule. Bennie attempted to contact Stan, Graham, and Basso, but they were not available. Finally, Bennie contacted someone named "Jim" who owned a pickup truck and they went to the airstrip but they never saw the airplane.

After arriving at the airstrip and not seeing anyone, Delarm and Bishop circled the strip until they were almost out of fuel. They then decided to dump the marijuana on a straight line toward Miami and to land at Opa Locka West airstrip. Upon attempting to land, the plane slid off the runway and both tires went flat.

Stan once again accused Bennie of stealing the marijuana. Ambrit, however, became satisfied that Bennie had not stolen the marijuana when they flew over the area where the bales were dropped and Ambrit saw Customs agents tagging and seizing the marijuana.

### G. THE SEPTEMBER 1980 SUCCESSFUL LOAD

Bennie accompanied Bishop to Key Largo to examine a Cessna 203, single-engine

aircraft.[6] Graham and Basso provided $18,000 needed to purchase the plane in exchange for Stan's agreement that Basso and Graham would enjoy sole distributorship rights to any marijuana Stan imported.

Bishop and a copilot flew to Jamaica, where Ambrit loaded 635 pounds of marijuana on board the plane. Bishop successfully piloted the craft back to the "Road to Nowhere" airstrip near Homestead. Stan, Bennie, Basso, Graham, Merritt and Beech took the marijuana to Beech's house.

## H. THE SEPTEMBER 1980 UNSUCCESSFUL LOAD

Ambrit's distrust of Stan led him to ask Bennie to run the next load alone without Stan's knowledge or assistance. Bennie agreed and offered to form a different ground crew than the one Stan had been using so as to avoid Stan knowing about the load. Bennie later contacted Stan and told him all the details of what had transpired. Stan agreed to allow Bennie to run the load as long as Stan could be close by to make sure that he did not get "ripped off."

Bishop suggested that it would be safer to attempt an air drop instead of an actual landing. Bennie agreed and chose a location in Dade County for the drop.

Bishop and a copilot flew the Cessna to Jamaica where Ambrit loaded 640 pounds of marijuana onto the plane. When the plane returned, Bennie and Jim were waiting at the drop site. Bishop's copilot dumped the marijuana but the bales scattered for about a mile and a half in every direction. Bennie recovered only 100 of the 640 pounds.

Bishop landed the Cessna at the Opa Locka West airstrip but the plane slid off the runway and got stuck in the mud. The next day, Metro-Dade police confiscated the aircraft. Stan later claimed that the plane had been stolen and recovered the aircraft after taking title in his name. Believing that Bennie had once again stolen from him, he declared that their partnership was over.

## I. THE JANUARY 1981 SUCCESSFUL LOAD

Alan Cates met Stan in January 1981 and agreed to pilot a flight carrying marijuana from Jamaica to an airstrip west of Lake Okeechobee called "Papa Joe's." John Craft flew with Cates in the Cessna 206 and pumped fuel from the drums inside the aircraft into the wing tanks. In Jamaica, marijuana suppliers named Babbs and Bigger loaded 900 to 1000 pounds of marijuana onto the plane. Cates successfully landed at "Papa Joe's," where Slusser, Stan, Ron Harrison, and several others off-loaded the marijuana. Gary Ferguson later paid Cates $25,000 for his work.

## J. THE APRIL 1981 UNSUCCESSFUL LOAD

At Stan's request, Cates and Harrison flew to Mississippi to retrieve an aircraft. Cates flew the aircraft back to the Tamiami airstrip in south Florida. Cates and Harrison then took a commercial flight to Jamaica for the purpose of inspecting a new landing strip.

Upon returning to south Florida, Cates, Craft, Harrison, and Basso made preparations for another load. Cates spent the night prior to departure at Stan's home in Homestead, as he had done prior to the previous load. As Cates and Craft were approaching Jamaica, the aircraft's fuel pump failed and Cates was forced to land the aircraft in the water. Cates and Craft were picked up by fishermen in the area but were eventually arrested by Jamaican immigration and police authorities for immigration violations. Bigger paid Cates's $600 fine and assisted Cates and Craft in returning to Kingston in order to obtain a commercial flight back to the United States. Harrison, Basso, and Graham met Cates upon his arrival at the Miami airport. Cates called Stan to let him know that he was back in the United States and to apologize for crashing the airplane.

---

**6.** Bishop was only able to pilot single-engine planes.

### K. THE MAY 1981 SUCCESSFUL LOAD

Harrison and Basso acted as co-managers in arranging another load. Cates called Slusser to arrange for use of Papa Joe's airstrip. Although Stan by this time was serving a sentence for an unrelated offense at Eglin Correctional Institution,[7] he telephoned Cates to instruct Cates to call Jamaica to make certain that Harrison and Basso had made proper arrangements with the Jamaican suppliers. Gilbert Chow, Babbs's brother, provided the aircraft in exchange for an agreement to use Babbs as marijuana supplier in Jamaica.

Cates and Henry Scott flew to Jamaica and picked up the marijuana. On returning to the United States, due to bad weather Cates was unable to locate Papa Joe's airstrip. He landed the plane in a cow pasture and walked to a nearby house where he telephoned Slusser. Slusser and two others off-loaded the marijuana and refueled the aircraft. Cates and Scott flew the plane back to Tamiami airport the next morning.

### L. THE JUNE 1981 SUCCESSFUL LOAD

A few days after Cates was paid $25,000 for his role in the May 1981 load, Harrison contacted Cates to request that he fly another load. The arrangements were the same as the prior flight except that Scott would serve as pilot and Cates would be copilot. Scott and Cates successfully returned to Papa Joe's airstrip with approximately 1000 pounds of marijuana. Later, at Basso's home Harrison and Basso paid Cates $7500. Cates declined to run another load and left Florida for several months.

### M. THE MAY 1982 UNSUCCESSFUL LOAD

Three weeks prior to Mother's Day 1982, Stan contacted his brother Ray to request that Ray assist in unloading a load of marijuana. Ray and Stan went to an Indian reservation airstrip to meet the flight pilot-ed by Mike O'Brien.[8] Ray and Bob Bogart were to block off the ends of the road where the airplane was to land.

When the plane came in for a landing, the tip of the plane's wing struck a horse trailer that Ray had failed to prevent from entering the landing area. Deputy Sheriff Carl Jenkins saw the plane land and gave chase. O'Brien and Parker jumped out of the aircraft and into Ray's pickup truck. Jenkins observed a blue and white El Camino truck at the scene with a license plate he later learned was registered to Stan. Jenkins pursued Ray's truck at high speeds. Ray, Parker, and O'Brien eventually jumped out of the pickup truck and ran into the woods where they spent the night hiding from police authorities. Ray telephoned Stan the next day, and Stan came to pick Ray up. Police confiscated Ray's pickup truck and the aircraft containing 619 pounds of marijuana.

### N. THE JUNE 1982 SUCCESSFUL LOAD

Cates and his girl friend, Joyce Colesanti, agreed with Stan to attempt to locate an aircraft that could be used to fly another load. Stan and Chow paid Cates's expenses for trips to look at airplanes. Cates and Colesanti purchased a Cessna 206 in early June 1982 for a price of $28,000. They paid for the aircraft with two cashier's checks in the name of Andrew Chuck and two cashier's checks drawn by a Robert L. Bosco, Stan Champion's alias.

Cates, Colesanti, Nolan, O'Brien, Chuck, and Chow went to inspect a new airstrip called the "Strazula Strip." After inspecting the strip from the air, Cates landed at the Ft. Pierce Airport. Lester Spainhoward met them at the airport and brought Colesanti, Cates, and Chow to the Strazula Strip. Spainhoward explained how secure the strip was and that his father would be there when the plane landed to provide

---

**7.** Stan was incarcerated at Eglin from mid-February 1981 until April 1982. Upon his release from prison, Stan entered a federal halfway house from which he allegedly took weekend furloughs to attend several off-loadings.

**8.** *See supra* note 7.

additional security.[9] Eldon Morgan was present at the Strazula Strip during this inspection. Spainhoward, Chow, Stan, Morgan, and Colesanti would serve as off-loaders.

About two weeks later, Cates and Chuck prepared for their flight to Jamaica. Colesanti, Chow, and "Sporty" installed seat tanks that Stan had designed to carry additional fuel. Cates piloted the flight to Jamaica where Babbs refueled the aircraft and loaded it with marijuana. Stan, Spainhoward, Morgan, Colesanti, Chow, and Sporty were present for the off-loading when the plane arrived at the Strazula Strip. Colesanti installed the regular seats and flew with Cates to the Ft. Pierce Airport. Cates later received $25,000 from Chow for piloting the flight.

### O. THE JULY 1982 SUCCESSFUL LOAD

In early July, Stan and Chow informed Colesanti that everything was set for another load. Colesanti called Spainhoward to get him to prepare for another landing at the Strazula Strip. Cates and Chuck flew to Jamaica, where Babbs loaded the marijuana onto the aircraft. Spainhoward, Morgan, Colesanti, Cates and Chuck off-loaded the marijuana at the Strazula Strip.

### P. THE JULY 1982 UNSUCCESSFUL LOAD

Cates and Colesanti took the aircraft on a vacation to South Dakota. Cates landed at Ft. Pierce and met Spainhoward to give him $10,000 that Stan owed Spainhoward. Spainhoward was eager to do another load.

Later that month, Stan and Chow telephoned Cates in South Dakota to tell him to bring the airplane back because they were ready for another load. The plan was to be the same as that used in the two prior successful loads. Cates and Colesanti flew back to south Florida. Problems arose soon after Cates and Chuck departed for Jamaica. Colesanti learned that a security guard had questioned Stan, Chow and

Sporty after observing them load the seat tanks onto the aircraft. She took steps to attempt to erase any suspicion that might have arisen. Nevertheless, when Colesanti, Spainhoward, Morgan and Chow were waiting for the airplane to arrive at the Strazula Strip, a police car entered the area. Spainhoward learned from his police radio that the car was in the area investigating a domestic disturbance. Soon a truck and another police car showed up and Spainhoward, Morgan and Chow left. Colesanti stayed to warn Cates.

When Cates landed, Colesanti ran out to the aircraft and told him that they were surrounded by police and that Cates should take off and land at a nearby strip that Spainhoward, Morgan, and Chow were lighting with flashlights. Cates advised her that he would not be able to take off in the tall grass because the plane was so heavily loaded. Cates, Chuck, and Colesanti unloaded the marijuana and attempted to hide it in the tall grass. They were forced to leave the fuel tank seats in the aircraft because the regular seats were in Spainhoward's truck. Colesanti noticed that a person standing next to a police car had been observing them. Cates and Chuck took off in the plane and Colesanti ran away. Colesanti evaded the police by hiding in canals and eventually made it to a highway where she hitchhiked back to Ft. Pierce.

Cates and Chuck flew to the Ft. Pierce Airport and met the others at a hotel. They soon learned that the aircraft and the marijuana had been seized. Cates, Colesanti, Sporty, and Chow returned to the Miami area in Chow's car.

Cates and Colesanti moved to South Dakota. Three weeks after they arrived in South Dakota, Cates was arrested and extradicted to Florida because his name was on the registration for the confiscated aircraft. Stan hired an attorney for Cates who returned to South Dakota after being released on bond.

**9.** Spainhoward's father was to be fishing near the entrance to the runway area. He would radio the others if anyone entered the area.

### Q. THE OCTOBER 1982 UNSUCCESSFUL LOAD

Nolan and O'Brien were piloting a load of marijuana back from Jamaica when their aircraft struck a wire and crashed into Lake June. Both Nolan and O'Brien were killed. Police divers found thirty-seven bales of marijuana and an invoice for the marijuana.

Graham and Stan were in the Lake June area when the crash occurred. Graham later told Colesanti that Nolan and O'Brien had been high on cocaine for several days prior to the flight. Stan's brother Ray drove Noreen Nolan, Mike Nolan's widow, to Stan's house because Ray felt that Stan owed her something. Although Stan denied at that time that he was involved in Mike Nolan's death, he later came to Noreen Nolan's home and gave her a brown paper bag containing $1500 in cash and said that it was to "help out," because Stan and Mike had been good friends.

### R. THE DECEMBER 1982 UNSUCCESSFUL LOAD

In December 1982, Stan and Chow pressured Cates into returning to south Florida to fly another load.[10] Stan provided an airline ticket and Cates returned to south Florida. After Cates refused Stan's request that Cates fly a load of marijuana from Mexico into Texas, Stan sent him to Texas to fly a Cessna 206 that Stan had paid to have released from Customs back to south Florida.

Stan had arranged for a load to be flown into a airstrip in south Dade County called "Wilbur's Field." Stan paid for Colesanti to fly in from South Dakota to calm Cates's nerves about using Wilbur's Field. Cates agreed to fly the load with Jeffery Powell as copilot.

On their return flight from Jamaica, Cates realized that their aircraft was being followed. His efforts to evade radar were unsuccessful and a Customs aircraft and a Metro-Dade Police helicopter landed next to him when he set the plane down at Wilbur's Field. Cates was arrested. The aircraft and the marijuana were seized.

After his release on bond, Cates met with Stan, Graham, and Powell at Graham's residence. At this meeting, Graham once again asserted that he had told Nolan and O'Brien not to get so drunk the night before they flew the load. Stan nudged Graham in the ribs and told him not to speak about it anymore. After this meeting, Cates and Colesanti became cooperating witnesses for the government.

### S. THE JUNE 1983 UNSUCCESSFUL LOAD [11]

In early 1983, Elwin "Oink" Williams introduced Stan to Robert Williamson. Williamson and "Rick" agreed to fly to Jamaica to pick up a load of marijuana. After some difficulties with the Jamaican police,[12] Williamson and Rick took off for the United States; someone, however, had neglected to replace the oil cap on the engine, and oil sprayed all over the windshield of the aircraft. Williamson turned the plane around and tried to land on the Jamaican airstrip but the soft ground caused the aircraft to crash.

Stan came to Jamaica and told Williamson that he should stay in Jamaica for a few days because he was attempting to arrange for another aircraft. Williamson returned to Miami a few days later and went with Graham to Stan's house to discuss their next load.

### T. THE OCTOBER 1983 UNSUCCESS-

---

**10.** Stan used the fact that Cates owed Stan for the attorney fees and bond costs that Stan had provided in Cates's prior arrest.

**11.** The trial judge ruled that the evidence of drug smuggling activities after December 1982 was not part of the conspiracy charged in Count 1. The court allowed the evidence of 1983 drug smuggling activities, however, under Fed.R.

Evid. 404(b) in the case of *United States v. Stanford Champion* only.

**12.** After Williamson landed, Jamaican police seized the aircraft and drained out all of the gasoline. The Jamaican marijuana suppliers negotiated for the release of the aircraft from police custody.

### FUL LOAD [13]

Stan next decided to attempt to drop marijuana from an aircraft to a boat. Williamson flew to Jamaica and picked up 420 pounds of marijuana but he was unable to locate the boat for the drop. Williamson landed on a nearby island, threw out the marijuana, and proceeded to Nassau.

### U. THE FINAL DAYS [14]

In November 1983, Stan, Williamson, and Billy Cheney stole an airplane from the Homestead Airport. After Williamson was arrested for stealing the plane, he began to cooperate with the Federal Bureau of Investigation and the Drug Enforcement Administration (DEA) as a confidential informant.

Williamson introduced DEA agent Charles Overstreet to Stan, and Overstreet expressed his willingness to pilot loads for Stan. Thereafter, however, neither Williamson nor Overstreet flew any loads for Stan, although Stan discussed marijuana importation during various meetings and telephone calls.

### II. SUFFICIENCY OF EVIDENCE

In reviewing claims of insufficiency of evidence, we must make all inferences and credibility choices in support of the jury verdict and examine whether a reasonable trier of fact could find that the evidence presented at trial established guilt beyond a reasonable doubt. *United States v. Warren*, 772 F.2d 827, 833 (11th Cir.1985), *cert. denied*, — U.S. ——, 106 S.Ct. 1214, 89 L.Ed.2d 326 (1986).

### A. VARIANCE

#### 1. *Single Versus Multiple Conspiracies*

Appellants Spainhoward, Slusser, and Morgan contend that they were prejudiced by a variance between the indicted single conspiracy and multiple conspiracies proved at trial. The government's theory was that appellants were part of a large marijuana importation conspiracy in which Stan Champion was the "hub" of the con-

spiratorial "wheel." These appellants allege, however, that the prosecution failed to produce evidence to prove the existence of a common "rim," see *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), and that this failure to prove a single conspiracy prejudiced appellants in that the jury allowed evidence from other conspiracies to "spill-over" upon them.

■ The question of whether the evidence supports finding a single conspiracy is a question of fact for the jury. *United States v. Anderson*, 782 F.2d 908, 914 (11th Cir.1986); *United States v. Rosen*, 764 F.2d 763, 765 (11th Cir.1985), *cert. denied*, — U.S. ——, 106 S.Ct. 806, 88 L.Ed.2d 781 (1986). In this case, the trial judge instructed the jury on multiple versus single conspiracies as follows:

[P]roof of several separate conspiracies is not proof of the single overall conspiracy charged in the indictment, unless one of the several conspiracies which is proved is the single conspiracy which the indictment charges.

What you must do is to determine whether the single conspiracy charged in the indictment existed between two or more conspirators. If you find that no such conspiracy existed, then as to this count, you must acquit the defendants, and that is as to Count I.

However, if you are satisfied that such a conspiracy did exist, you must then determine who were the members of the conspiracy. If you find that a particular defendant is a member of another conspiracy, not the one charged in the indictment, then you must acquit that defendant.

This instruction is substantially identical to the instruction approved by this court in *United States v. Darby*, 744 F.2d 1508, 1542 (11th Cir.1984), *cert. denied*, 471 U.S. 1100, 105 S.Ct. 2322, 85 L.Ed.2d 841 (1985). We concluded in *Darby*, that "[i]n light of this instruction, we regard the jury's verdict of guilty as an implicit finding that the

---

**13.** *See supra* note 11.

**14.** *See supra* note 11.

overall conspiracy charged in the indictment existed and that [the defendant] participated in it." *Id.* Nevertheless, we proceed, as we did in *Darby,* to determine whether the record supports the jury's findings.

Our recent decision in *United States v. Caporale,* 806 F.2d 1487 (11th Cir.1986), provides substantial guidance in our evaluation of appellants' claims. In *Caporale,* the court indicated that two inquiries must be made in evaluating whether a variance between allegations and proof is reversible error: (1) whether a material variance did indeed occur; and (2) whether the appellants suffered substantial prejudice as a result of the variance. *Id.* at 1499. As to the question of whether a material variance exists, the court declared that:

> [E]ven if the evidence arguably establishes multiple conspiracies, there is no material variance if a reasonable trier of fact could have found beyond a reasonable doubt the existence of the single conspiracy charged in the indictment. In determining whether a reasonable trier of fact could have found a single conspiracy, the courts in this Circuit have looked at three factors: (1) whether a common goal existed, (2) the nature of the scheme, and (3) overlap of participants.

*Id.* at 1499–1500 (citations omitted). The *Caporale* court concluded that no material variance existed in that case. The court went on, however, to indicate that even if a material variance did exist, courts have found prejudice to substantial rights where: (1) the proof at trial differed so greatly from the charges in the indictment that the defendant was unfairly surprised and had an inadequate opportunity to present a defense; and (2) there are so many defendants and so many separate conspiracies before the jury that there is a substantial likelihood that the jury would transfer evidence from one conspiracy to a defendant involved in another conspiracy.

*Id.* at 1500 (citations omitted). The *Caporale* court found that the evidence failed to demonstrate prejudice from any variance under these standards.

 The evidence presented at trial in this case supports the conclusion that a scheme existed with the common goal of importing marijuana into the United States. Each of the loads alleged as part of the conspiracy involved transporting large quantities of marijuana by small aircraft from Jamaica into south Florida. Although the airplanes, airstrips, and some of the personnel changed, the purpose and the basic means of implementing the importation objectives were consistent throughout.

Undoubtedly the weakest link in the government's single conspiracy theory was the lack of significant overlap of some participants. Stan Champion was the only defendant linked to all eighteen of the loads allegedly involved in the conspiracy in the period from December 1979 to December 1982. Viewing the evidence in the light most favorable to the government, appellant Slusser was involved in five loads in the time period of April 1980 to June 1981. Appellants Spainhoward and Morgan were each linked to three loads in the period from June 1982 to July 1982. Moreover, the involvement of each of these appellants was restricted to certain geographic areas.[15]

Appellants argue that there is a limit to the extent to which the illegal activities of an individual over a period of years can constitute the "hub" of a single, ongoing conspiracy. *See United States v. Sutherland,* 656 F.2d 1181 (5th Cir. Unit A Sept. 1981)[16] (evidence of a common conspirator and similar objectives insufficient to support finding of single conspiracy), *cert. denied,* 455 U.S. 949, 102 S.Ct. 1451, 71 L.Ed.2d 663 (1982). Appellants Spainhoward and Slusser contend that the evidence established at least five conspiracies. Appellant Morgan contends that the evidence

---

15. Evidence at trial indicated that Slusser's involvement was limited to landings in the Lake Okeechobee area. Spainhoward and Morgan were linked only to landings in the Ft. Pierce area at the Strazula Strip.

16. The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

established three or four separate conspiracies.

Appellants' arguments are quite similar to those raised in *United States v. Stitzer*, 785 F.2d 1506, 1518 (11th Cir.1986). In *Stitzer*, the appellant contended that the evidence established five separate conspiracies with only one defendant as the "common thread among the groups." *Id.* The court concluded that, viewing the evidence in the light most favorable to the government, "the jury reasonably could have found the existence of a single conspiracy with Baldwin as the central hub," because the evidence indicated that Baldwin was the major distributor in the cocaine distribution scheme and Marte-Perna partnership was a principal sub-distributor.

 We conclude that a reasonable jury could have found beyond a reasonable doubt that the single conspiracy to import marijuana charged in the indictment existed in this case. Here, as in *Stitzer*, the evidence indicated that Stan Champion was the chief coordinator of the importation scheme throughout and Basso and Graham were the primary distributors of all marijuana that Stan managed to import. Although the Jamaican suppliers, pilots, and off-loading crews varied somewhat, a material variance is not established merely because each coconspirator did not participate in every phase of the conspiracy. *United States v. Jenkins*, 779 F.2d 606, 617 (11th Cir.1986); *United States v. Brito*, 721 F.2d 743, 746 (11th Cir.1983); *United States v. Grassi*, 616 F.2d 1295, 1303 (5th Cir.), *cert. denied*, 449 U.S. 956, 101 S.Ct. 363, 66 L.Ed.2d 220 (1980).

The evidence in this case provides even stronger support for the jury's finding that a single conspiracy existed than did the evidence found sufficient by this court in *United States v. Cole*, 755 F.2d 748 (11th Cir.1985). Despite the fact that the marijuana importation was accomplished through a variety of means and only one

coconspirator was common to the entire operation, we reasoned in *Cole* that "[n]otwithstanding the fact that the identities of those participating in the offloading and onloading of the boats, airplanes, trucks, ships, and houses occasionally differed from load-to-load, the evidence clearly indicates that each ... knowingly, intentionally, and voluntarily participated in the illegal enterprise." *Id.* at 764. We therefore concluded that a reasonable trier of fact could have found beyond a reasonable doubt that a single conspiracy existed whose goal was achieved through various drug smuggling ventures. *Id.* at 765. We believe that the result in *Cole* compels a similar disposition of appellants' claims in this case.

Having concluded that there was no material variance between the indicted single conspiracy and the proof at trial, we need not reach the issue of whether appellants have alleged sufficient prejudice to their substantial rights. We note, however, that the fact that two defendants were acquitted of all charges,[17] and nearly all defendants were acquitted of some of the charges [18] suggests that the jury was able to sift the evidence as to each defendant individually. *United States v. Caporale*, 806 F.2d 1487, 1501 (11th Cir.1986). In such circumstances, it is unlikely that the jury allowed the evidence to "spill-over" to prejudice appellants' substantial rights.

### 2. *Dates and Locations of Offenses*

Appellants Slusser and Champion contend that they were prejudiced by variances concerning the dates and locations of the charged offenses. Slusser argues that his convictions on Counts 18 and 19 must be reversed because the indictment charged Slusser with importation and possession with intent to distribute *on or about April–May 1981 in Dade County, Florida*. Slusser contends that the only evidence of his

---

17. Defendants Henry Scott and William Bishop were acquitted of all charges.

18. Appellant Champion was acquitted on Counts 4–9, 14–17, 24, and 25. Appellant Slusser was acquitted on Counts 8, 9, and 14–17. Appellant

Spainhoward was acquitted on Counts 20–25. Appellant Morgan was acquitted on Counts 20–25. Defendant Ron Harrison was acquitted on Counts 14–19. Defendant John Craft was acquitted on Counts 14 and 17.

involvement in 1981 related to events in May-June 1981 outside of Dade County near Lake Okeechobee.

■ Appellant Slusser's variance claims are without merit. First, evidence at trial linked Slusser to the cow pasture load in May 1981. This proof is not at variance with the indictment's allegation that Slusser committed the substantive offenses "on or about April-May 1981." When the prosecution uses the "on or about" designation, proof of a date reasonably near to the specified date is sufficient. *United States v. Grapp,* 653 F.2d 189, 195 (5th Cir. Unit A Aug.1981). Second, although proof at trial indicated that Slusser's involvement in the cow pasture load took place near Lake Okeechobee rather than in Dade County, Slusser has presented no evidence of prejudice. An indictment that specified the place of the offense as the Southern District of Florida would have sufficiently informed Slusser of the place of his alleged offense. *See United States v. Harrell,* 737 F.2d 971, 975 n. 4 (11th Cir.1984), *cert. denied,* 469 U.S. 1164, 105 S.Ct. 923, 83 L.Ed.2d 935 (1985). Although a material variance may exist where an indictment specifies the *wrong* county, Slusser's showing of prejudice amounts to a generalized allegation of inability to defend. Variance from an indictment is not, however, prejudicial in all cases, and prejudice is not assumed. *United States v. Ard,* 731 F.2d 718, 725 (11th Cir.1984). Any variance in this case is therefore immaterial because Slusser has failed to demonstrate any prejudice to his substantial rights.

Champion's argument is more difficult to decipher. He seems to contend that he was prejudiced by the fact that the jury was told about five or six uncharged loads which operated to "obliterate the appearance of structure" in the conspiracy charge, leaving no overall conspiracy that was found by the jury. In addition, he argues that the fact that he was acquitted of certain substantive counts somehow necessitates a conclusion that the jury could not have found an overall conspiracy.

■ Appellant's arguments miscomprehend the nature of what constitutes a material variance. As we stated in *United States v. Gold,* 743 F.2d 800, 813 (11th Cir.1984), *cert. denied,* 469 U.S. 1217, 105 S.Ct. 1196, 84 L.Ed.2d 341 (1985), "a variance exists where the evidence at trial proves facts *different* from those alleged in the indictment, as opposed to facts which, although not specifically mentioned in the indictment, are entirely consistent with its allegations." The evidence relating to certain uncharged loads during the time period of the indicted conspiracy,[19] and evidence relating to charged loads for which Champion was later acquitted, is entirely consistent with the alleged conspiracy. Appellant's claim must, therefore, fail because no material variance existed.

## B. KNOWLEDGE OF IMPORTATION

■ Appellants Slusser, Spainhoward, and Morgan contend that their convictions on the conspiracy count must be reversed because there was insufficient evidence for the jury to find that these appellants knew that the marijuana was imported from outside of the United States. In order to sustain appellants' convictions for conspiracy to import marijuana, the evidence must be sufficient to show that each of the appellants knew the marijuana was imported. *United States v. Bollinger,* 796 F.2d 1394 (11th Cir.1986). This knowledge may be shown by direct or circumstantial evidence. *United States v. Bascaro,* 742 F.2d 1335, 1360 (11th Cir.1984), *cert. denied sub nom. Hobson v. United States,* 472 U.S. 1017, 105 S.Ct. 3476, 87 L.Ed.2d 613 (1985), *Villenueva v. United States,* 472 U.S. 1017, 105 S.Ct. 3477, 87 L.Ed.2d 613 (1985), *Waldrop v. United States,* 472 U.S. 1021, 105 S.Ct. 3488, 87 L.Ed.2d 622 (1985).

**19.** As we noted above, the trial court ruled that the evidence was insufficient to support a finding that the conspiracy charged in Count 1 continued beyond December 1982. No evidence was presented, however, concerning events outside of the time period of the indicted conspiracy (December 1979 to September 1984), and appellant Champion does not argue that the court erred in admitting the post-1982 evidence against him under Fed.R.Evid. 404(b).

■ We hold that there was sufficient direct and circumstantial evidence in this case from which the jury might infer that each appellant knew that the marijuana was coming in from outside of the United States. In *Bascaro*, 742 F.2d at 1360, we considered the massive quantity of marijuana involved as a factor supporting the inference of knowledge of importation. The substantial quantity of marijuana that appellants helped to off-load from the aircraft in this case was unlikely to have been brought to south Florida from somewhere inside of the United States. Moreover, in *United States v. Corbin*, 734 F.2d 643, 652 (11th Cir.1984), we held that appellants' coordinated efforts to off-load a boat "in close conjunction with those physically responsible for bringing the marijuana into the country," was a sufficient basis upon which the jury might infer that appellants knew that the marijuana was imported. Evidence at trial indicated that Slusser, Spainhoward, and Morgan each personally helped the pilots with the off-loading of the marijuana and each interacted with Stan,[20] the pilots, and other coconspirators.[21]

There was further evidence, in addition to appellants' roles in assisting in off-loading substantial quantities of marijuana, that supported the jury's inference that appellants knew the marijuana came from outside the United States. After Stan helped Ambrit, the marijuana supplier in Jamaica, collect the money that Slusser owed him, Ambrit stated that Stan could deal directly with him "as Slusser had done." Appellants Morgan and Spainhoward were present along with Cates, Colesanti, Chuck, Chow, Nolan, and O'Brien at the Strazula Strip inspection in June 1982. At this inspection, the group's discussion included the fact that Morgan and Spainhoward were to help with off-loading the marijuana. Two weeks later, when Morgan and Spainhoward were present at the Strazula Strip to assist with the off-loading, Colesanti removed the fuel seat tanks and reinstalled the regular aircraft seats.[22] Spainhoward was in charge of security at the Strazula Strip and Colesanti telephoned him directly to tell him to prepare for the Strazula landings. A reasonable jury could have concluded beyond a reasonable doubt based upon the totality of this evidence that appellants were aware of the fact that the marijuana was coming from somewhere outside of the United States.

## C. INTENT TO DISTRIBUTE

Slusser contends that his conviction for possession with intent to distribute (Count 19) must be reversed because there was insufficient evidence that he intended to distribute marijuana. Slusser concedes that there was evidence linking him to the cow pasture load in May 1981. He contends, however, that there was no direct evidence that he intended to distribute the marijuana and that intent to distribute cannot be inferred because there was no evidence as to the quantity of marijuana recovered.

---

**20.** Appellant Slusser agreed with Stan Champion to provide security and landing strips for several loads. He met with Stan and showed him various airstrips that might meet Stan's needs. Spainhoward and Stan supervised the off-loading at the Strazula Strip in June 1981. Morgan drove Stan in Stan's car to the Strazula Strip where the landing was to occur.

**21.** We find no merit to appellants' suggestion that the inference to be drawn from close association with those responsible for importing the contraband is somehow lessened when an aircraft is used to import the contraband rather than a boat. Although it is true that "a defendant will not be held to have knowledge of any illegal importation solely on the basis of evidence that one or more of his alleged co-conspirators had such knowledge," *Bascaro*, 742

F.2d at 1360, the court in *Bollinger* noted that the fact that a defendant had extensive dealings with several coconspirators who knew that the contraband was imported is a factor supporting the inference that the defendant also knew the drugs were imported. *Bollinger*, 796 F.2d at 1405.

**22.** The fact that fuel tanks made into seats were installed in the aircraft and were removed when the off-loading was completed suggests that the marijuana was flown a substantial distance. The replacement of the seats in this case, however, provides somewhat limited support for the jury's inference of knowledge of importation in that there was no evidence that Spainhoward or Morgan actually knew that fuel tank seats were utilized.

■ A reasonable jury could have concluded that Slusser intended to distribute the marijuana in the May 1981 load. Even though there was no evidence as to the weight of the marijuana that Cates piloted in from Jamaica, the evidence made it clear that the aircraft contained a sufficient quantity to permit the jury to infer intent to distribute.[23] *See United States v. Montes-Cardenas*, 746 F.2d 771, 778-79 (11th Cir.1984).

## III. IN COURT IDENTIFICATION

■ At trial, when Cates was testifying as to the details of the January 1981 load, he stated that when he landed at Papa Joe's airstrip "a gentleman named Gene and Ron Harrison were there." Cates stated that he did not know Gene prior to that meeting. Cates was then asked, "do you see anybody in the courtroom now who you knew at that time as Gene?" Cates responded that he did not. Later, Cates testified that he recognized Gene Slusser's voice in a subsequent telephone conversation because Cates had met Slusser at Papa Joe's airstrip in January 1981. At that point, Cates identified Slusser in court as the man he saw at Papa Joe's. In the voir dire that followed, Cates indicated that he had not been able to see Slusser in the courtroom when he was first asked to identify him because the row of defense attorneys blocked his view. Slusser's motion for a mistrial on the basis of a taint in Cates's identification was denied.

Slusser's claim must fail because he has produced no evidence indicating that the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification. *Albert v. Montgomery*, 732 F.2d 865, 871 (11th Cir.1984). There is no evidence to suggest that Cates was lying when he stated that his initial failure to identify Slusser was due to the fact that his view of Slusser was obstructed.[24] Thus, the identification procedure was not impermissibly suggestive and the motion for a mistrial on that basis was properly denied.

## IV. NEWLY DISCOVERED EVIDENCE

Appellant Stanford Champion argues that the district court erred in denying his motion for a new trial on the basis of newly discovered evidence which would have further impugned the credibility of Bennie Champion's testimony. At trial, Bennie testified that he and Stan decided to assist Delarm by securing bond and an attorney when Delarm was arrested after the August 1980 load. Bennie went to Earl Hauk, "the bail bondsman," to get Hauk to post bond for Delarm. After the trial was over, Stan's counsel learned that Hauk's license as a registered bondsman in Florida had been revoked prior to August 1980. In arguing that the evidence requires a new trial, appellant now suggests that the government may have wilfully suppressed this evidence.

■ Because a motion for new trial is addressed to the sound discretion of the trial court, the court's decision to deny a new trial motion will not be reversed absent an abuse of discretion. *United States v. Martinez*, 763 F.2d 1297, 1312 (11th Cir. 1985); *United States v. Russo*, 717 F.2d 545, 550 (11th Cir.1983). In the case of a

---

**23.** Cates called Slusser after landing in the cow pasture to get him to off-load the marijuana. Slusser and two others assisted in off-loading the marijuana into a pickup truck. It is obvious that this plane-load of marijuana, like the loads before and after it, involved a substantial quantity of marijuana.

**24.** The trial judge took steps to make certain that Cates's subsequent in-court identification had not been induced by extraneous influences during the mid-afternoon recess. The court heard testimony from Sergeant Henning who had spoken with Cates during the recess. Although the primary topic of their conversation was aviation, Cates indicated to Henning that he had not been able to see some of the people in the courtroom. Henning later passed this information on to one of the United States Attorneys. Slusser's counsel cross-examined Cates as to extraneous influences during the recess. Cates stated that as he was on his way out of the courtroom, he had mentioned to one of the prosecutors that he had not been able to see everyone in the room. The prosecutor did not discuss this topic with Cates, show any pictures to Cates, or point out any of the defendants to Cates.

motion for new trial based upon newly discovered evidence, five elements must be present to justify a new trial: (1) the evidence must be discovered following trial; (2) the movant must show due diligence to discover the evidence; (3) the evidence must not be merely cumulative or impeaching; (4) the evidence must be material to issues before the court; and (5) the evidence must be of such a nature that a new trial would probably produce a new result. *United States v. Bollinger*, 796 F.2d 1394, 1401 (11th Cir.1986).

██ The newly discovered evidence urged by appellant as a basis for granting his motion for a new trial fails to satisfy at least three of the elements necessary to justify a new trial. First, the evidence would, at most, tend to impeach Bennie Champion's credibility. Newly discovered impeaching evidence is insufficient to warrant a new trial. *United States v. Vitrano*, 746 F.2d 766, 770 (11th Cir.1984). The evidence is also cumulative in that the defense impeached Bennie at trial by producing proof that he had lied while under oath and that he used and dealt in a variety of narcotics. Second, appellant has offered very little by way of explanation as to why he could not, in the exercise of due diligence, have discovered this "new" evidence.[25] Finally, it is extremely unlikely that introduction of evidence that Hauk was not registered as a bondsman would have produced a different result. Bennie and Hauk may still have arranged bond for Delarm even though Hauk was no longer licensed as a bail bondsman. Even if the new evidence would have led the jury to believe that Bennie lied about arranging

for Delarm's release, this hardly suggests that Stan would have been acquitted of any of the charges for which he was convicted.

## V. MISSTATEMENT BY PROSECUTOR

██ Appellant Champion also argues that the trial court erred in failing to correct an alleged misstatement of the evidence in the prosecutor's rebuttal closing argument. At the end of the government's rebuttal closing argument, the prosecutor suggested to the jury that Stan, who had to support his family on a job paying $250 a week, would not have been able to rent a land cruiser for $2000 and take his family and his babysitter on a vacation unless he had additional income coming in from his drug-smuggling activities.[26] Appellant objected to the prosecutor's argument because it allegedly implied that Stan paid for the land cruiser in cash. In fact, Stan used a credit card for the purchase and did not have to pay the bill until about one month later. After appellant's counsel was unable to locate the credit card receipt, the court overruled the objection and instructed the jury that "the objection, while I am sure it was well innocently made with good intention, was an incorrect objection. There is no reason to, or no basis to support the nature of the objection that was made, and I am overruling it." When the prosecutor had finished his closing argument and the judge prepared for recess, counsel located the credit card receipt evincing the fact that Stan had charged the land cruiser rental fee. The court decided that it was too late to allow the receipt into evidence.

---

**25.** Appellant produced absolutely no evidence to support his assertion that the government wilfully suppressed the evidence about Hauk not being registered as a bondsman in August 1980. Absent some evidence suggesting wrongdoing, the trial court was not obligated to grant a hearing to enable appellant to conduct a fishing expedition as to why the government chose to present its case in the manner in which it did.

**26.** The prosecutor stated:

Look at this letter offering Mr. Champion's employment when you get back there and see if you find that, while Mr. Champion was in the half-way house, after he had been released

from prison, that he was offered a job paying $250 a week, and then ask yourselves how does a man who has just been released from prison in a half-way house during which time he was making $250 a week, support his family on that money and still have enough money to pay over $2,000 to rent a land cruiser, to go on a vacation?

Ask yourselves, ladies and gentlemen, if it is unreasonable to believe that Mr. Champion was able to pay over $2,000 for that land cruiser because he was getting additional money from the loads of marijuana that were being flown in from Jamaica.

Appellant's argument is without merit because the prosecutor's comments were not improper. The prosecutor's statement drew a permissible inference from the evidence in this case. He merely pointed out that Stan incurred a financial obligation that would appear to have been more than he could afford at that point in time. The prosecutor did not argue that Stan paid in cash. Moreover, appellant had the credit card documentation throughout the trial but he failed to proffer the evidence until the evidence and arguments had closed.

## VI. EVIDENTIARY RULINGS

Appellant Champion also takes issue with several evidentiary rulings. On review, we will not disturb the trial court's evidentiary rulings unless the court has clearly abused its broad discretion in this area. *United States v. Martin,* 794 F.2d 1531, 1532 (11th Cir.1986); *United States v. Rosenthal,* 793 F.2d 1214, 1241 (11th Cir.1986). We find no clear abuse of discretion as to any of appellant's issues.

### A. TESTIMONY OUTSIDE PERSONAL KNOWLEDGE

■ Appellant contends that the testimony of Noreen Nolan, Mike Nolan's widow, should not have been admitted because it consisted of opinion testimony outside of her personal knowledge. Fed.R.Evid. 602. We disagree.

Noreen Nolan testified that she accused Stan of involvement in her husband's death but that Stan denied having any part in it. She further testified that Stan came to her house later and gave her some cash in a paper bag, stating that the money was to "help out" because her husband and Stan had been good friends. Nolan's testimony regarding these events was based upon her personal knowledge, and the court's decision to admit the testimony was not a clear abuse of discretion.

### B. ADOPTIVE ADMISSION

■ Appellant further argues that the court erred in allowing Cates to testify

regarding a conversation between Cates, Graham, and appellant. Cates testified that, after the Lake June crash, he asked appellant and Graham what had happened with Nolan and O'Brien. Graham allegedly replied, "I had told him not to drink so much." Stan then nudged Graham in the ribs and told him that he did not want him to speak about the incident any more.

The trial court did not clearly abuse its discretion in admitting this testimony. Stan's verbal and nonverbal response to Graham's admission was a statement[27] in which he manifested his adoption or belief in the truth of Graham's statement. The testimony was therefore admissible as nonhearsay under Fed.R.Evid. 801(d)(2)(B). *See, e.g., United States v. Carter,* 760 F.2d 1568, 1579–80 (11th Cir.1985) (silence as adoptive admission).

### C. PREJUDICIAL TESTIMONY

■ Appellant also takes issue with the court's decision to allow testimony regarding the fact that Stan Champion was in prison and in a halfway house during a portion of the conspiracy. Evidence indicated that appellant made telephone calls from prison to assure that certain loads had been properly arranged, and that appellant personally assisted in off-loading operations while on furlough from a halfway house. Appellant argues that the testimony at trial failed to establish anything more than Cates's assumptions or vague recollections that the telephone conversations were related to the smuggling business. Appellant suggests that the court should have excluded the evidence because the limited probative value of the evidence was substantially outweighed by the danger of undue prejudice. Fed.R.Evid. 404(b), 403.

We conclude that the evidence relating to Stan's incarceration and time in a halfway house was properly admitted because it was linked together in time and circumstances with the conspiracy charged and was necessary "[t]o make the crime com-

---

27. Fed.R.Evid. 801(a) defines a "statement" as: "(1) an oral or written assertion or (2) nonver-

bal conduct of a person, if it is intended by him as an assertion."

prehensible to a jury." *See United States v. Mills,* 704 F.2d 1553, 1559 (11th Cir. 1983), *cert. denied,* 467 U.S. 1243, 104 S.Ct. 3517, 82 L.Ed.2d 825 (1984); *United States v. Williford,* 764 F.2d 1493, 1498 (11th Cir. 1985). If the government had been prevented from presenting evidence as to Stan's incarceration, the jury might have accorded undue weight to the fact that Stan was not physically present at the off-loadings during the period in which he was in jail. As such, the evidence of Stan's incarceration was essential to avoiding jury confusion as to the government's single conspiracy theory. In such circumstances, we need not engage in a Rule 404(b) analysis. *Williford,* 764 F.2d at 1499. Moreover, even if the evidence were improperly admitted, the substantial independent evidence of Stan's guilt reduces the likelihood that the testimony had a substantial impact upon the jury verdict. *United States v. Anderson,* 782 F.2d 908, 916 (11th Cir. 1986).

## VII. CONCLUSION

The judgments and convictions of each of the appellants are affirmed.

AFFIRMED.