[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-12198
Non-Argument Calendar
_____

D.C. Docket No. 1:14-cr-20221-PAS-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JUAN ALEJANDRO RODRIGUEZ CUYA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(April 25, 2019)

Before WILLIAM PRYOR, BRANCH and JULIE CARNES, Circuit Judges.

PER CURIAM:

Juan Alejandro Rodriguez Cuya appeals *pro se* the denial of his motion for a new trial following his convictions for conspiracy, 18 U.S.C. § 1349, mail and wire fraud, *id.* §§ 1341, 1343, and attempted extortion, *id.* § 1951(a), related to his and his mother's use of their companies in Peru and Miami, Florida, to defraud Spanish-speaking residents of the United States. *See* Fed. R. Crim. P. 33. Rodriguez Cuya argued his newly-discovered evidence established that government witnesses Fernando Moio, Cinthya Guerrero, and Pia Silva testified falsely at trial. The district court ruled that Rodriguez Cuya's evidence did not warrant a new trial and denied his request for an evidentiary hearing. We affirm.

## I. BACKGROUND

We divide our background in two parts. First, we describe the scheme to defraud and the trial testimony of Moio, Guerrero, and Silva and other evidence that supported Rodriguez Cuya's 26 convictions. Second, we describe Rodriguez Cuya's motion for a new trial and its denial by the district court.

### A. Rodriguez Cuya's Scheme to Defraud and Resulting Convictions

The government presented testimony from Rodriguez Cuya's employees and victims, bank records, email communications, recorded telephone conversations, and internal business records that established Rodriguez Cuya supervised his employees in Peru as they used scripts he had composed to extort money from victims by demanding they pay for fabricated orders by threatening them with

2

bogus lawsuits, detentions, and seizures of property. *United States v. Cuya*, 724 F. App'x 720, 723–24 (11th Cir. 2018). After victims agreed to pay fictional "fees," their calls were routed to Miami where his mother, Luzula, and her employees processed credit card payments. *Id.* at 723. Between October 2012 and January 2014, their conspiracy swindled over $2 million from more than 8,000 victims. *Id.*

Moio, a telecommunications engineer, contracted with Rodriguez Cuya and Luzula to build an electronic database and telephone recording system shared by their Peru and Miami offices. Moio described discussions he had with Rodriguez Cuya and Luzula about the system, and he authenticated recordings of extortion calls and customer files catalogued on the system. Moio also recounted visiting the Peru office several times between 2010 and 2012 and observing Rodriguez Cuya in control of its operations, which was consistent with numerous emails Rodriguez Cuya sent identifying himself as the "Manager" of "Everglades."

Emails Moio exchanged with Luzula corroborated his testimony about his trips to Peru. On April 27, 2012, Luzula sent Moio an email asking "what time . . . [he would] arrive in Lima." On May 14, 2012, Moio sent Luzula an email that, "as you know I remain in Lima . . . to modify[] a few errors" in the system.

Moio, who was a native of Argentina, admitted to misrepresenting that he was Cuban. During direct examination, he testified about purchasing a fraudulent birth certificate that identified him as a native of Cuba and that he used to remain

3

in the United States and to obtain a tourist visa and a marriage license in Florida. Moio stated during cross-examination that he had been convicted of and faced deportation for using a fraudulent Cuban passport.

Guerrero, who was hired in July 2012 by Rodriguez Cuya to work in Luzula's Miami office, testified about its conversion to extortion activities by the fall of 2012. Guerrero described how employees in the call centers that Rodriguez Cuya managed in Lima and Cajamarca, Peru, would represent they were attorneys, would threaten to institute legal actions against victims unless they paid a large fine for items they had not ordered or had not received, and would relent when the victims agreed to pay 10 to 30 percent of the fine with a credit card. Guerrero also testified that Rodriguez Cuya and Luzula shared equal ownership of a single company, that they talked daily using Skype or the telephone, that she overheard Rodriguez Cuya ask Luzula for more cash to purchase customer lists, and that Rodriguez Cuya sent emails using the assumed name Henry Ivanovich. Guerrero also testified that Luzula sent half of the extortion proceeds to Rodriguez Cuya.

Emails that Rodriguez Cuya sent revealed the extent of his activities. For example, on February 12, 2013, Rodriguez Cuya forwarded to Luzula a script of "the final sales speech" in which his caller said he was from the "Legal Notifications Department" giving notice of "a subpoena . . . [being issued] next week from the Legal Department of your city" for a "lawsuit . . . filed against [the

4

victim] for **PROVEN LACK OF FULFILLMENT OF COMMITMENT**" for which was owed a "**PREVENTATIVE FINE of $1714.00**," but the victim could "file an **SETTLEMENT ACTION** . . . to dismiss the proceeding" by "**pay**[ing] **16% of** [the] **fine** . . . **through a credit, debit or prepaid card** . . . ." On August 19, 2013, Rodriguez Cuya sent Luzula an email about buying customer lists. And on July 23, 2013, Rodriguez Cuya sent an email instructing an employee to "review the closing company speech" script and to submit "any changes."

Guerrero stated on cross-examination that she made no legitimate sales calls between October 2012 and December 2013. She stated that she began feeling uncomfortable with her job between March and April of 2012, but she remained with Luzula because she needed the income. Guerrero also stated that she secretly cooperated in exposing the fraud.

Rodriguez Cuya attempted to impeach Guerrero with an affidavit and by asking about her bias, but he abandoned using the affidavit. When Rodriguez Cuya asked Guerrero whether she prepared an affidavit that did not mention seeing him manage the Peruvian office, the government objected to a lack of foundation. The district court advised Rodriguez Cuya that he had to authenticate the affidavit, and he withdrew the question. Rodriguez Cuya next asked Guerrero about testifying to avoid prosecution, and she denied being worried and said she was blameless.

Like Guerrero, Silva testified that Luzula changed her business from sales to extortion. According to Silva, in 2010, Luzula's Miami office marketed natural products through commercials that connected purchasers to sales employees in Peru. In 2012, the Miami office began collecting payments for extortion calls made by employees in the Peru offices who had threatened to report the victims to credit agencies or to commence legal actions if they refused to pay by credit card for items they had not ordered or received. Silva testified that the database and recording system catalogued records of the victims' accounts and related extortion calls. She also testified that the Miami office sent half of its proceeds to the Peru office and, by the end of 2013, 99 percent of the calls from Peru involved extortion. Silva said that she continued to work for Luzula, even after visiting the Peru office in December 2012 and hearing its employees make extortion calls under the supervision of Rodriguez Cuya, and that she waited until December 2013 to resign from the Miami office because she had to pay for college. Silva testified about intercepting emails Luzula received from Rodriguez Cuya, who used the email address "henry-ivanovich@hotmail.es," and about discussing the emails with Rodriguez Cuya.

Silva stated during cross-examination that she lied to and failed to warn victims who called the Miami office to complain. Silva also stated that she faced a long sentence and deportation if prosecutors decided to indict her. When defense

6

counsel asked Silva if she would lie to remain free, Silva responded that she resigned because she disagreed with the extortion.

The government also presented testimony from some of Rodriguez Cuya's victims and corresponding extortion calls that had been stored on his recording system. Victim Luz Padron, a nurse, testified that she purchased a belt advertised on a Spanish-speaking television channel and that, a few months after receiving a box containing the belt and some weight-loss pills that she had not ordered, she received a call demanding payment for the pills to avoid a legal action. In the recording of the call to Padron, the caller said that he was an attorney, that he had mailed her a summons, and that she needed to appear in court with counsel and pay a fee of $1,700, but he ultimately accepted $200 from her in settlement. The recording of the telephone call to victim Paula Tinoco corroborated her testimony that a caller said he was from a legal department and threatened to detain her for failing to pay for more shipments of weight loss patches than she had ordered. In the recording, the caller said he worked for the state legal department, he warned her about being sued, detained, and having her property seized for failing to pay a fine of $1,700, and she settled the matter by paying $255. In another series of recorded calls played for the jury, Rene Gonzalez contested being double-charged for weight-loss products and being threatened with a lawsuit, and an extortion caller demanded a fine exceeding $2,000 for Gonzalez's wife purchasing and

7

wrongfully returning treatments and also threatened to sue Gonzalez to recover an $800 fine ostensibly owed to the FDA for returned packages.

The jury found Rodriguez Cuya guilty of conspiring to commit mail and wire fraud, 18 U.S.C. § 1349, nine counts of mail fraud, *id.* § 1341, fourteen counts of wire fraud, *id.* § 1343, and two counts of attempted extortion, *id.* § 1951(a). The district court sentenced him to 210 months of imprisonment. We affirmed his convictions and sentence on appeal. *Cuya*, 724 F. App'x at 723–26.

### B. Rodriguez Cuya's Motion for a New Trial

While his appeal was pending, Rodriguez Cuya moved *pro se* for a new trial and an evidentiary hearing. Fed. R. Crim. P. 33. He argued that newly-discovered evidence revealed that the government had presented perjured testimony from Guerrero, Moio, and Silva; that the falsehoods were material under *Giglio v. United States*, 405 U.S. 150 (1972); and that the introduction of or failure to correct testimony that the government knew was false violated *Napue v. Illinois*, 360 U.S. 264 (1959). Rodriguez Cuya contended that reports obtained from the Peruvian government proved that Guerrero and Moio testified falsely about traveling to that country in 2012; that Guerrero admitted during a recorded telephone call to testifying falsely about visiting the Peru office; and that a paycheck Luzula's office issued in January 2014 established that Silva testified falsely that she had resigned in December 2013. Rodriguez Cuya alleged that he

8

was surprised by what he knew to be false statements from the three witnesses during trial and later he collected evidence that proved they committed perjury.

Rodriguez Cuya identified four items as newly-discovered evidence. He produced one-page travel reports for Guerrero and for Moio that were issued in 2016 by the Immigration National Superintendency of Peru and that stated Guerrero and Moio last entered Peru in March 2008. Rodriguez Cuya also produced a transcript of a telephone call that his wife made to Guerrero after trial in which she supposedly admitted that an American coerced her to testify against him and an affidavit from his wife stating that she called Guerrero on July 9, 2016, "asked her why she mentioned in the trial of . . . Rodriguez Cuya, having gone to the Everglades office," and "[s]he answered that was not true, she never went there (office Peru), and that her work was only in office Miami." Rodriguez Cuya also produced a check, which his wife discovered while inventorying Luzula's office, that was made payable to Silva for $548.04 on January 4, 2014, for working at the Miami office between December 23, 2013, and January 4, 2014.

The government opposed Rodriguez Cuya's motion and argued that an evidentiary hearing was unnecessary. With respect to the travel reports, the government argued that Rodriguez Cuya knew whether Guerrero and Moio had traveled to Peru in 2012 and should have raised the subject during cross-examination; that the reports were missing their second page, which stated, "the

9

database is in the process of audit, in case of notic[ing] an imprecision, we appreciate communicat[ing] with the General Of. Of Administration and Finances"; and that the reports constituted impeachment material. Additionally, the government argued that the trial record contained evidence corroborating Moio's travel to Peru and that Guerrero's recorded statements were contrived, ambiguous, and unsubstantiated and the call was inadmissible as recorded without her permission. With regards to Silva, the government argued that Rodriguez Cuya could have obtained the paycheck during trial, it never was deposited, and it was immaterial.

Rodriguez Cuya filed a supplemental motion to which he attached a copy of the entire transcript of the telephone call between his wife and Guerrero. During the telephone call, Rodriguez Cuya's wife asked Guerrero why she refused to cooperate with the defense and testified falsely, and his wife suggested that surveillance recordings would show that Guerrero had not visited the Peru office. The transcript of this telephone call states as follows:

> RCW: . . . the last time we spoke was to see if you were willing to cooperate and you never went (unintelligible)
>
> . . .
>
> G: . . . nobody ever called me . . . . But likewise I haven't heard any more about that, moreover when I moved to Chicago I told Brian . . . It was Brian, right?
>
> RCW: Uh.

10

G: . . . I said to him, "Brian, look, . . . I'm not going to do anything more, so don't count on me for anything because (unintelligible) what we knew, in brief.

. . .

RCW: . . . [my husband is] already involved in the appeal and searching for evidence . . . he mentioned, when you testified, you mentioned that you had gone to the office, to Peru . . . this could not have been true, well, right? . . .

. . .

G: Well, the truth, (unintelligible) because I don't recall anything because the day that I went there, I don't know what day it was, but I had to (unintelligible) they put us in a separate room and when I spoke with . . .

RCW: Right . . .

G: . . . an American, (unintelligible). He was (unintelligible), what we knew, the truth, we had to say that.

RCW: Um, because, this, well, since they're analyzing all that for their defense . . . you know that there, in San Borja, there are cameras and all that and that according to the date . . . that you were supposedly there, eh, they're trying to find out . . . all the movement well of that month . . . Because they're going to analyze this because you know that his father knows how to handle things down there and all that . . . Cynthia, why did you say that? . . .

G: But I really don't recall what I said. (unintelligible) barely what I had to be saying all that . . .

RCW: . . . But, (unintelligible), that is, I don't know, did they require you to testify that way? Because, because if that's that way, they're surely going to be going at some time.

. . .

11

G: And I don't want them to be calling me . . . . I don't know what he's saying . . . . And another thing, let me tell you, and my boyfriend now I told him (unintelligible) . . . everything, everything that had happened.

. . .

RCW: . . . due to the appeal I looking for and collecting everything that could be used for his defense and among those thing Alex was mentioning that part, right? That you said that you went to the office and that's not true, since you've never been to the office.

G: No, no, in San Borja and Peru, no. The only office that I went to was the one here in Miami.

The district court dismissed Rodriguez Cuya's motion for lack of jurisdiction, but after we vacated that order and remanded for further consideration, the district court denied the motion. The district court ruled that the travel reports and the paycheck could have been discovered with diligence, constituted impeachment evidence, and would not have changed the outcome of Rodriguez Cuya's trial. The district court also ruled that Rodriguez Cuya knew of and could have cross-examined Guerrero and Moio about their allegedly false testimony and that the date Silva left Luzula's employ was immaterial to the issues at trial. The district court also rejected Rodriguez Cuya's claim involving the telephone call with Guerrero because "there [was] nothing in the transcript indicating that [she] knew she was being recorded" and because "the contents of the transcript . . . at best, is the basis for impeachment." The district court denied Rodriguez Cuya's

12

request for an evidentiary hearing as "unwarranted" based on the evidence and the "knowledge [it] gained from presiding over the trial . . . ."

## II. STANDARD OF REVIEW

We review the denial of a motion for new trial, *United States v. Isaac Marquez*, 594 F.3d 855, 860 (11th Cir. 2010), and for an evidentiary hearing, *United States v. Schlei*, 122 F.3d 944, 990 (11th Cir. 1997), for abuse of discretion. That "standard allows a range of choice for the district court, so long as that choice does not constitute a clear error of judgment." *United States v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc) (internal quotation marks and citation omitted).

## III. DISCUSSION

Rodriguez Cuya raises two issues. First, he argues that the district court should have held an evidentiary hearing to evaluate his claims of prosecutorial misconduct because the government did not submit a responsive affidavit. Second, Rodriguez Cuya argues that he is entitled to a new trial because the government knowingly used perjured testimony at trial, which he proved with his newly-discovered evidence. We address these arguments in turn.

The district court reasonably determined that an evidentiary hearing was unnecessary. Although Rodriguez Cuya alleged prosecutorial misconduct, which we have identified as a "unique circumstance" that may warrant an evidentiary

13

hearing, *United States v. Hamilton*, 559 F.2d 1370, 1373 (5th Cir. 1977), he submitted no evidence that the government suborned perjury. The district court was equipped to evaluate the evidence that Rodriguez Cuya submitted and to rule on his posttrial motion based on "the acumen [it] gained . . . over the course of the proceedings . . . without a hearing." *Schlei*, 122 F.3d at 994 (quoting *Hamilton*, 559 F.2d at 1373–74).

The district court did not abuse its discretion by discounting Rodriguez Cuya's arguments for a new trial based on *Giglio* and *Napue*. Even if we were to assume that Moio, Guerrero, and Silva testified falsely, Rodriguez Cuya failed to prove that the prosecutor knew of or "failed to correct what he subsequently learned was false testimony" from those witnesses. *See United States v. McNair*, 605 F.3d 1152, 1208 (11th Cir. 2010); *United States v. Agurs*, 427 U.S. 97, 103 (1976). Moio's testimony about visiting the Peru office in 2012 was corroborated by emails Moio exchanged with Luzula. Rodriguez Cuya argues that the telephone call established that the government coached Guerrero to lie about traveling to Peru, but Guerrero stated that she was instructed to tell the truth and testified at trial that she met with prosecutors twice "for them to know what she knew" and "not for them to prepare [her] regarding the questions." Rodriguez Cuya also argues that his cross-examination should have alerted the prosecutor that Guerrero's testimony was false, but "the suggestion that [Guerrero's] statement

14

[about observing him in Peru] may have been false is simply insufficient; [Rodriguez Cuya had to] conclusively show that the statement was actually false." *See Maharaj v. Sec'y for Dep't of Corr.*, 432 F.3d 1292, 1313 (11th Cir. 2005). And the prosecutor could not have known that Silva lied about the date her employment ended when the paycheck was not listed in the company bank records and was discovered unexpectedly in Luzula's office.

The district court also did not abuse its discretion when it rejected Rodriguez Cuya's arguments for a new trial based on newly-discovered evidence. To merit a new trial based on newly-discovered evidence, Rodriguez Cuya had to prove that he discovered the evidence after trial, that the failure to discover the evidence earlier was "not due to [his] lack of due diligence," that the evidence was "not merely cumulative or impeaching," that the evidence was material, and that "the evidence [was] such that a new trial would probably produce a different result." *United States v. Jernigan*, 341 F.3d 1273, 1287 (11th Cir. 2003). Rodriguez Cuya's failure to satisfy those elements "defeat[ed] [his] motion for a new trial." *See United States v. Starrett*, 55 F.3d 1525, 1554 (11th Cir. 1995).

Rodriguez Cuya failed to act with due diligence to discover the reports. *See United States v. Champion*, 813 F.2d 1154, 1171 (11th Cir. 1987) (observing that appellant "offered very little . . . explanation" why he failed to discover the new evidence earlier). Rodriguez Cuya alleged that he knew during trial that Moio and

15

Guerrero testified falsely. Because the travel reports were available through a public website, Rodriguez Cuya could have obtained and used the reports to cross-examine Moio and Guerrero. Moreover, with respect to Moio, the travel report was nothing "more than impeachment evidence" to the extent it conflicted with his testimony and the emails he and Luzula sent in 2012 about his presence in Peru.

Guerrero's recorded statements also were, "at best, . . . the basis for impeachment," and were unlikely to "result[] in a different outcome at trial." Guerrero stated during the recorded telephone call that she did not go to the office in Peru, but most of her trial testimony that Rodriguez Cuya managed the Peruvian office was based on her familiarity with the hierarchy of the company and her knowledge of emails that Rodriguez Cuya sent Luzula and of conversations she overheard between the two of them. *See id.* ("Newly discovered impeaching evidence is insufficient to warrant a new trial."). Even if Rodriguez Cuya had impeached Guerrero's testimony about observing him manage the Peru office, that impeachment would not have tipped the balance of the evidence to call into question the jury's verdicts. *See United States v. Reed*, 887 F.2d 1398, 1404–05 (11th Cir. 1989). The government presented numerous emails, business and bank records, and recorded telephone conversations that established Rodriguez Cuya's managing role in the scheme to extort. Furthermore, Silva testified about traveling

16

several times to Peru where she saw Rodriguez Cuya supervising the call center employees, and he does not challenge her testimony.

The district court also did not abuse its discretion in determining that Silva's paycheck was not material to the issues at trial. Rodriguez Cuya argues that Silva's paycheck proved that she did not genuinely object to the extortion, but Rodriguez Cuya explored Silva's culpability and motives on cross-examination. *See United States v. Jones*, 601 F.3d 1247, 1266–67 (11th Cir. 2010). And nothing about the paycheck calls into question Silva's testimony about the role Rodriguez Cuya played in the extortion. *See United States v. Taohim*, 817 F.3d 1215, 1223 (11th Cir. 2013).

## IV. CONCLUSION

We **AFFIRM** the denial of Rodriguez Cuya's motion for a new trial.