**UNITED STATES of America, Appellee,**

v.

**Phillip L. SACKETT,
Defendant-Appellant.**

**No. 782, Docket 78–1288.**

United States Court of Appeals,
Second Circuit.

Argued March 20, 1979.

Decided May 1, 1979.

Arthur A. Chalenski, Jr., Asst. U. S. Atty., Syracuse, N. Y. (George H. Lowe, U. S. Atty. of the Northern District of New York, Syracuse, N. Y., of counsel), for appellee.

Earl D. Butler, Vestal, N. Y., for defendant-appellant.

Before LUMBARD and OAKES, Circuit Judges, and BRIEANT, District Judge.*

LUMBARD, Circuit Judge:

Defendant Phillip L. Sackett appeals from a judgment of conviction entered August 10, 1978 after a jury trial before Judge Munson in the Northern District of New York on an indictment charging Sackett with making a false statement for the purpose of influencing a federally-insured bank on a loan application in violation of 18 U.S.C. § 1014. Sackett argues that his conviction should be reversed (1) because he never signed the loan application form at issue but made only oral misstatements, and (2) because the jury verdict was not supported by competent evidence. We affirm.

On March 30, 1976, Sackett was being trained to become a branch manager for the Endicott Bank of New York, having previously been employed for two years as a loan collector at the same bank. On March 30, he telephoned Gary Oliver, a personal friend who worked at Bankers Trust of Binghamton and whose responsibilities included processing loan applications and granting loans. Sackett asked Oliver whether he could obtain a loan for his mother, Mary L. Watson, so that she could buy a 1976 Ford Thunderbird. Sackett agreed to co-sign for the loan since his mother had only recently moved to the area.

When Oliver indicated that a loan to Sackett's mother could be arranged, Sackett proceeded to give Oliver all the information necessary for Oliver to fill out the application forms. As a personal favor to Sackett, Oliver agreed to fill out the required forms over the telephone, avoiding an extra trip to the bank. Sackett admitted that he knew at the time that Oliver was transcribing onto the loan application form the information he was communicating over the telephone.

As Oliver went through the form line by line, Sackett provided him with the information needed to fill out each item. Sackett did not, however, disclose that he and his mother, as joint obligors, had taken out a loan for $37,200 from the Endicott Bank of New York, Sackett's employer, in November 1975. Sackett had used the proceeds of this loan to purchase a motor home which he registered in his name. As of March 30, 1976, Sackett and his mother still owed $35,960 on this loan.

When Oliver asked Sackett whether his mother owned a car, and whether there were any monies due on the vehicle, Sackett did not mention the motor home. When Oliver asked Sackett whether his mother had any outstanding debts, Sackett replied,

* Of the Southern District of New York, sitting by designation.

"None at all. . . ." When Oliver asked Sackett whether he had any outstanding debts, Sackett said that his only outstanding debt was $750 owed to the Endicott Bank of New York. Sackett admitted that Oliver accurately transcribed onto the loan application forms the information he gave him over the telephone, with the single exception of the failure to note Mrs. Watson's obligations under the motor home note. Sackett testified at trial that he had fully disclosed this debt to Oliver. Oliver, however, testified that Sackett did not tell him about this loan for the motor home. The jury believed Oliver and not Sackett.

Later that day, Oliver obtained the necessary credit bureau checks and the approval of his superior for the loan. Although neither Oliver nor his superior would have approved the loan had they known of the motor home indebtedness, they gave their approval on the ground that Mrs. Watson would be able to make payments totalling $242 monthly.

On April 1, 1976, Oliver called Sackett and told him that the loan had been approved. Sackett traveled to the bank office and picked up the note and the security agreement. At home, his wife signed the documents and Sackett signed for his mother.

On April 2, 1976, Sackett returned to the bank with the note and the security agreement. Oliver then showed Sackett both Sackett's and Mrs. Watson's application forms. Sackett signed his own application form, the promissory note, and the agreement, but he did not sign his mother's application form, even though bank procedures would normally require that he do so. Sackett then took the check for $9,103 from Oliver.

Since Mrs. Watson was the primary obligor on this loan, life insurance in an amount equal to the outstanding balance was available for Mrs. Watson without physical examination. Sackett procured such insurance. On April 22, 1976, Mrs. Watson died and the life insurance company paid off the loan in the amount of $11,653.92. On March 27, 1976, three days before Sackett applied for the auto loan, Mrs. Watson had executed a will bequeathing her entire estate to Sackett. Accordingly, while the life insurance company was left to pay off the car loan, Sackett inherited both the new car and the motor home. According to the government, these events came as no surprise to Sackett, but rather, followed a carefully laid plan which received its genesis in March, 1976, when Sackett first learned that his mother was dying from cancer.

On February 14, 1978, a three-count indictment was filed in the Northern District of New York charging Sackett with violating 18 U.S.C. § 1014, which provides that:

> Whoever knowingly makes any false statement or report . . . for the purpose of influencing in any way the action of . . . a Federal Savings and Loan Association . . . upon any application . . . or loan . . shall be fined not more than $5,000 or imprisoned not more than two years, or both.

All three counts of the indictment relate to the circumstances described above surrounding the making of the loan to Mrs. Watson, for which Sackett was the co-signer. Counts I and III charged Sackett with misrepresenting his own prior indebtedness. Count II charged him with misrepresenting his mother's prior indebtedness. After a three-day trial, the jury found Sackett guilty on Count II.

Sackett's principal claim on appeal is that 18 U.S.C. § 1014 does not embrace oral statements. Since he never signed his mother's application form, he claims that he did not make a written misstatement and that he therefore did not violate § 1014. Our review of the statute and of the cases, however, provides no support for Sackett's contention that § 1014 applies only to written statements.

First, the statute by its terms covers "any false statement." Common sense indicates that "any statement" means both written and oral statements. Nor did predecessor sections of Title 18 require that false statements be written to be violations. Second,

the cases clearly hold that both oral and written statements are covered by the statute. *See, e. g., Reass v. United States,* 99 F.2d 752 (4th Cir. 1938); *United States v. Zavala,* 139 F.2d 830 (2d Cir. 1944). More recently, in *United States v. Hubbell,* No. 76–1119 (November 15, 1976 (unpublished)),[1] the Tenth Circuit affirmed a § 1014 conviction based on an oral misrepresentation, despite the absence of any written loan application.

■ Sackett's next claim is that there was insufficient evidence for the jury to conclude that Sackett "knowingly" made a false statement. Sackett claims that since he never filled out Mrs. Watson's application and never signed it, he could not be found to be familiar with its contents. The answer to this argument is that the jury found on sufficient evidence that Sackett had orally misrepresented to Oliver his mother's financial condition. Sackett was convicted for making this oral statement and not for what was later written on the application, even though what Oliver wrote on the form was strong evidence of what Sackett said over the telephone. Inasmuch as Sackett admitted at trial that he knew about the motor home loan, and was in fact making the payments on it, there is little weight to his contention that he did not know that his oral statements were false. Accordingly, we hold that there was sufficient evidence for the jury to find that Sackett knowingly made a false statement.

■ Sackett's next complaint is that he was unduly prejudiced by the prosecution's introduction of evidence tending to show that he knew that his mother was dying at the time he applied for loan. Since the loan in question was not so clearly for the direct benefit of Sackett, the prosecution introduced evidence showing that Sackett could and did obtain life insurance on his mother's life for the value of the loan without any medical examination, that he was the sole beneficiary under her will at the time the loan was taken out, and that he must have believed that she could not survive the 48 month period of the loan. This evidence, taken together, tended to show how Sackett might have expected to gain from procuring a loan in his mother's name in March, 1976: at her death, Sackett would inherit the car purchased with the loan proceeds while the insurance company would pay off the loan. The evidence was more than sufficient to allow the jury to find that a reasonable person in Sackett's place would have concluded that Mrs. Watson was dying and therefore the rest of the government's motive evidence was also admissible. Evidence of Mrs. Watson's condition after the loan was made, including her death on April 22, 1976, as tending to show her condition before the loan was made, was properly admitted, and cannot be ground for objection without some evidence tending to show that there was some change in the intervening time-period. *See generally,* 2 J. Wigmore, Evidence, § 225 (3rd ed. 1940).

■ Sackett next claims that a certain hospital record was not admissible because it was hearsay: the "history" portion of the hospital report of Mrs. Watson's admission on March 31, 1976, which stated that, "She was kept at home with the family, but apparently she had been doing worse and the family felt that she was probably pre-terminal and arranged for her admission here." We hold that this statement within the record was admissible despite the hearsay rule. First, the record itself was admissible under the business records exception to the hearsay rule. Fed.R.Evid. 803(6) broadly permits the admission of records "in any form, of acts, events, conditions, opinions, or diagnoses . . . if kept in the course of a regularly conducted business activity . . . ." Because the statements at issue have some relevance to diagnosis or treatment, they were kept "in the course of" the regularly conducted business activity of the hospital. *See* McCormick's Handbook of the Law of Evidence § 313, at 731 (E. Cleary ed. 1972). Second, the state-

1. Although the decision in *Hubbell* was not published, we note that Rule 17(c) of the United States Court of Appeals for the Tenth Circuit provides that "[u]npublished opinions . . . can . . . be cited, if relevant in proceedings before this or any other court."

ments made to the nurse and transcribed onto the hospital record were introduced only to prove the state of mind of Sackett and his wife. They were not introduced to prove the truth of the matter asserted, that Mrs. Watson was dying, and therefore were not hearsay within hearsay. Even if Mrs. Watson was not pre-terminal, this statement was admissible to show that her family thought she was, which was all the prosecution was trying to prove. *Cf. United States v. Frank,* 494 F.2d 145, 155 (2d Cir. 1974).

Sackett's last contention on appeal is that the court admitted, over objection, documents tending to show that Sackett himself had actually purchased, registered, and used in his own name the motor home which was the basis for the earlier loan to Mrs. Watson which was not disclosed when Sackett applied for the second loan. Sackett claims that these documents were not relevant to any material issue at trial and, furthermore, that they were highly prejudicial as evidence of similar prior acts. These documents, however, were not introduced merely to show that Sackett had a propensity for making these kinds of transactions. They were introduced to prove that Sackett knew about the previous loan to Mrs. Watson which he failed to disclose when applying for the second loan. To show knowledge of the previous loan, the government showed that Sackett completed the previous loan application, executed the promissory note, and treated the motor home purchased with the proceeds as his own. Sackett's activity in obtaining the loan and his personal use of the motor home, purchased with the proceeds of the previous loan, were certainly relevant to proving Sackett's knowledge of the existence of that loan when he applied for the second loan.

Conviction affirmed.