UNITED STATES of America, Plaintiff–Appellee,

v.

Ronald P. SORENSEN, Defendant–Appellant.

No. 97–50555.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 8, 1998.

Filed June 8, 1999.

824

Linda J. Ballard DeVore (argued), Tacoma, Washington, for the defendant-appellant.

Nora M. Manella, United States Attorney, Monica Bachner, Susan R. Ficcadenti, Assistant United States Attorneys, Santa Ana, California; Tammy Spertus (argued), Assistant United States Attorney, Los Angeles, California, for the plaintiff-appellee.

Before: KOZINSKI, O'SCANNLAIN, Circuit Judges, and LOVELL,* District Judge.

Opinion by Judge O'SCANNLAIN; Dissent by Judge LOVELL.

O'SCANNLAIN, Circuit Judge:

We must decide whether a mortgage broker can be convicted of making false statements with regard to a loan application which was never signed.

I

In 1994, the FBI began a series of sting operations investigating mortgage brokers and other individuals suspected of loan fraud. As part of this effort, a confidential informant for the FBI, Vincent Schuman, contacted Ronald P. Sorensen, a mortgage broker. Posing as a borrower, Schuman told Sorensen that he was looking for a mortgage broker to help him obtain a loan from the Resolution Trust Corporation ("RTC") to finance a purchase of residential property. The two men set up an in-person meeting to be held at Schuman's apartment.

After this conversation, the FBI caused documents purporting to be a sales contract for a house in Santa Barbara (the one Schuman told Sorensen he intended to purchase) to be delivered to Sorensen. The contract indicated that the selling price was $350,000 and that Schuman had placed a down payment of $150,000. Thus, it appeared that Schuman needed a loan of $200,000 to cover the remainder of the purchase price.

Schuman and Sorensen met in person on January 24, 1995, and the FBI covertly videotaped the meeting. At the outset, Sorensen asked Schuman what the source of his down payment was. Schuman told him that he had obtained a loan from his uncle. Schuman noted that the funds for the down payment were in a bank account under his name, but that the money belonged to his uncle. Sorensen told Schuman that he would just write on the loan application that the money for the down payment was from his bank account.

The conversation then turned to the subject of Schuman's employment. Schuman explained that he had not been employed, or filed tax returns, for ten years. Sorensen said that such facts were not problematic and that he would just put down that Schuman was self-employed, commenting that no one would take the time to verify this information.

Sorensen continued filling out the loan application, later inquiring about Schuman's ownership of automobiles. Schuman told Sorensen that he did not own any cars, but that he drove his uncle's Rolls Royce and Ferrari. Sorensen explained that to be approved for the loan Schuman would have to list ownership of a car, noting that this information would not be

---

* The Honorable Charles C. Lovell, United States District Judge for the District of Montana, sitting by designation.

checked by anyone. Sorensen then asked again for a car listing. This time, Schuman stated he had a BMW. The loan application listed Schuman as owning a $50,000 BMW.

When Sorensen asked what other property Schuman owned, Schuman informed him that he owned no property. Sorensen explained that they would have to list something because most people with this much money have items such as antiques or paintings. Again, Sorensen noted that the accuracy of this information would not be checked. Sorensen and Schuman agreed to list Schuman as owning $30,000 in jewelry on the application.

Sorensen then called Irene Kennedy of the RTC and asked what documentation she would need for a loan. Kennedy told Sorensen that all the RTC needed was a form 1003, a standard loan application. Sorensen agreed to fax the form 1003 to her.

After the call, Sorensen told Schuman that "we have to show income, and we have to put down that you do something." Sorensen then put down that Schuman was self-employed, writing that Schuman was self-employed by V.M.S. Enterprise (a fictitious company name upon which the two men agreed). Sorensen instructed Schuman to have the V.M.S. Enterprise listed in directory information. Sorensen and Schuman then worked on deriving a false income figure to list on the form 1003.[1] Sorensen then said he would type up the information and fax it to Kennedy.

On January 26, 1995, Sorensen caused a seventeen-page loan application to be faxed to Kennedy. This document included the following false statements: that Schuman had been self-employed by V.M.S. Enterprise for ten years, that his

income from employment was $12,000 per month, that he owned a $50,000 BMW, and that he owned $30,000 in jewelry. Neither Sorensen nor Schuman, however, had signed the loan application.

On February 27, 1997, the government filed a single-count indictment charging Sorensen with submitting a false statement to the RTC with intent to influence action on a loan in violation of 18 U.S.C. § 1014. A First Superseding Indictment was filed on May 15, 1997, alleging the same offense. This Indictment charged the following:

> SORENSEN knowingly made and caused to be made a false statement and report to the Resolution Trust Corporation ("RTC") for the purpose of influencing action on a loan. That is, in order to obtain a $200,000 mortgage loan from the RTC on behalf of the Borrower, defendant SORENSEN submitted and caused to be submitted to the RTC a residential loan application [containing false statements].

Sorensen pled not guilty. After a three-day trial, the jury returned a verdict of guilty. Sorensen was sentenced to one day of imprisonment and a fine of $2,500. Sorensen now appeals, arguing that the government failed to produce sufficient evidence at trial to support his conviction.

## II

It is undisputed that Sorensen submitted a purported loan application containing false statements to the RTC. It is similarly undisputed that the form was unsigned. The pivotal question in this case is whether a violation of section 1014 can be established where the false statements made by Sorensen to the RTC are contained only on a loan application that was unsigned.[2]

---

**1.** During their conversation, Schuman repeatedly stated that he was willing to have documents forged to support his application. Sorensen, however, refused each time, stating that he wanted to avoid using forged documents.

**2.** The dissent cites the fact that neither party briefed the issue of whether there was ever an "application" for purposes of section 1014. However, this is largely irrelevant because, as the dissent concedes, the parties cannot deprive the court of jurisdiction by their agreement. *Cf. United States v. Dickerson,* 166

In answering this question, we begin, as we must, with the text of the statute. *See United States v. Wells*, 519 U.S. 482, 117 S.Ct. 921, 926, 137 L.Ed.2d 107 (1997). Section 1014 provides, in relevant part, that: "Whoever knowingly makes any false statement or report ... for the purpose of influencing in any way the action of ... the Resolution Trust Corporation ... upon any application ... or loan ... shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both." 18 U.S.C. § 1014. Sorensen contends that, because the document he submitted was unsigned, it cannot constitute an "application" for purposes of section 1014. Therefore, he argues, he cannot be convicted of attempting to influence the RTC "upon any application" for the simple reason that there was no "application" upon which the RTC could have been influenced.

In *United States v. Zwego*, 657 F.2d 248 (10th Cir.1981) the defendant made false statements orally to a federally insured bank, but never submitted a formal loan application. *See* 657 F.2d 248, 250–51 (10th Cir.1981). Nevertheless, the Tenth Circuit held that such oral statements could form the basis of a violation of section 1014 because the bank in question had a policy of granting loans on the basis of an oral application and without a written, signed application. *See id.* In the present case, by contrast, the government expressly conceded at oral argument that the RTC lacks the power to grant a loan without a signed application and never funds a loan until after it receives a *signed* loan application. Accordingly, we must conclude that the government failed to establish that Sorensen made false statements for the purpose of influencing the action of the RTC "upon any application" as required by section 1014.[3]

In reaching this conclusion, we are persuaded by the Fifth Circuit's recent decision in *United States v. Jobe*. *See* 101 F.3d 1046 (5th Cir.1996). Stanley Jobe was found guilty of violating section 1014 because he was listed as a guarantor on a co-defendant's loan presentation form (which differs from a loan application), which contained false statements. Jobe himself never submitted a formal loan application containing a false statement. *See id.* at 1064–65. The Fifth Circuit reversed Jobe's conviction, reasoning that, because there had been no loan application on which Jobe had made a false statement, the evidence was insufficient to support his conviction under section 1014. *See id.* at 1065. Sorensen's conviction must similarly be reversed because the government failed to produce evidence of a signed loan application containing false statements.[4]

F.3d 667, 682 (4th Cir.1999) ("Even where the parties abdicate their responsibility to call relevant authority to this Court's attention, they cannot prevent us from deciding the case under the governing law simply by refusing to argue is.") (internal citations omitted). Moreover, although not extensively addressed in the parties' briefing, this issue was explored in depth at oral argument.

3. The government makes much of the fact that section 1014 prohibits the making of false statements to influence the RTC "in any way." *Id.* The government contends that the fact that the RTC lacks the power to grant a loan without such a signed application is immaterial because section 1014 covers the influencing of the RTC *in any way*. According to the government, upon receipt of an unsigned loan application, the RTC takes other, preliminary steps to determine whether to fund the loan (such as obtaining credit reports and appraisals), such that the jury could reasonably have concluded that Sorensen made false statements that influenced the RTC in some way.

Even though the government is correct that section 1014 does prohibit the influencing of the RTC "in any way," the government's theory nevertheless fails to recognize the statutory requirement that the influencing be "upon any application." As explained earlier, there was no application upon which the RTC could have been influenced. Accordingly, the government has not produced sufficient evidence to establish the statutory requirements of section 1014.

4. We pause to note that we are *not* holding that the making of false statements on an unsigned application can *never* violate section 1014. Rather, we hold, consistently with the plain statutory language, that section 1014

## IV

Sorensen may well have intended to defraud the RTC.[5] Nevertheless, his actions never matured into a violation of section 1014 because he did not submit an application upon which the RTC could have granted a loan. Because the government failed to offer evidence supporting an essential element of the statutory crime, we must reverse.[6]

REVERSED and REMANDED.

LOVELL, District Judge, Dissenting:

I respectfully dissent because (1) the majority view unduly constricts the scope of the statute contrary to the plain intent of congress; (2) well-reasoned decisions in the Tenth and Second Circuits are squarely against the majority's holding here; and (3) the majority has decided the case for appellant on an issue surrendered by appellant in the briefs—that there was an application within the meaning of the statute. This denied the government the opportunity effectively to argue either orally or in brief that there was an application—a circumstance which leads me to believe the case should be reargued on that issue.

1. *The statute:* "Whoever knowingly makes any false statement or report . . . for the purpose of influencing in any way the action of . . . the Resolution Trust Corporation . . . upon any application . . . or loan . . . [shall have committed an offense against the United States]." 18

U.S.C. § 1014. Note that the statute covers "any false statement," conveying the plain intent of congress that *any* false statement is proscribed—not just written statements, not only written statements that are signed, and not only statements that are contained in the application. Note also that the statute covers "any application," again evidencing expressly the intent of Congress that *any* application is included—not just those that are written, and certainly not only those which are written and signed by the defendant, and not only those containing a false statement.

Once it is recognized that the false statement need not be contained in the application it becomes clear that the correct focus and emphasis of the statute is on the false statement, not on the niceties of the application.

2. *The cases.* The Second Circuit held contrary to the majority's determination here in *United States v. Sackett*, 598 F.2d 739 (2d Cir.1979). That case is best summarized by this quote:

Sackett's principal claim on appeal is that 18 U.S.C. § 1014 does not embrace oral statements. Since he never signed his mother's application form, he claims that he did not make a written misstatement and that he therefore did not violate § 1014. Our review of the statute and of the cases, however, provides no support for Sackett's contention that

prohibits making false statements on applications. The lack of a signature is relevant in this particular case because the RTC defines an application as a signed form. In the cases discussed by the dissent, the institutions in question had different definitions of the crucial term "application." Crucially, they were willing to disburse money based on oral representations or unsigned forms.

5. Sorensen argues that he did not. He claims that he purposefully submitted an unsigned application because he viewed the submission of an unsigned form as a preliminary stage before the actual formal application, such that he would have the opportunity to amend the application after verifying the information

contained in the unsigned form 1003. According to Sorensen, he normally submits a loan application only after verifying the information contained therein, but submitted a loan application earlier in this case because of repeated urging by Kennedy (Sorensen's contact at the RTC) to send the form 1003 forthwith. To comply with her requests, but to leave himself an opportunity later to verify the loan application information, Sorensen explained he submitted an unsigned application with the intention of later verifying the veracity of the information.

6. Because we reverse for insufficient evidence, we need not address Sorensen's remaining claims of error.

§ 1014 applies only to written statements.

First, the statute by its terms covers "any false statement." Common sense indicates that "any statement" means both written and oral statements. Nor did predecessor sections of Title 18 require that false statements be written to be violations. Second, the cases clearly hold that both oral and written statements are covered by the statute. *See, e.g., Reass v. United States,* 99 F.2d 752 (4th Cir.1938); *United States v. Zavala,* 139 F.2d 830 (2d Cir.1944). More recently, in *United States v. Hubbell,* No. 76–1119 (November 15, 1976 (unpublished)), the Tenth Circuit affirmed a § 1014 conviction based on an oral misrepresentation, despite the absence of any written loan application.

*Sackett,* 598 F.2d at 741. See also footnote 1 to the opinion which states:

> Although the decision in *Hubbell* was not published, we note that Rule 17(c) of the United States Court of Appeals for the Tenth Circuit provides that "(u)npublished opinions ... can ... be cited, if relevant in proceedings before this or any other court."

*Id.* at 742 n. 1.

The *Hubbell* decision is significant because it helps to explain the holding in *United States v. Zwego,* 657 F.2d 248 (10th Cir.1981), a case relied on by the majority. *Hubbell* is addressed by *Zwego* as follows:

> However, for purposes of section 1014 it is not necessary that the application for the loan be formal. In *United States v. Hubbell,* No. 76–1119 (10th Cir.), we affirmed a section 1014 conviction based on an oral misrepresentation despite the absence of a formal loan application. We found "that the statute does not call for a formal application. Its terms apply to anyone who knowingly makes any false statement or report, ... upon any application. No formalities are demanded." *Id.*
>
> It is clear that both oral and written statements are covered by the statute.

> In addition, it is not necessary that the false statement be an "application" in and of itself. *See United States v. Sackett,* 598 F.2d 739 (2d Cir.); *United States v. Hubbell,* No. 76–1119 (10th Cir.).

*Zwego,* 657 F.2d at 250.

Because *Zwego* purports to rely upon *Hubbell* and cites *Sackett,* it seems clear the *Zwego* court would have reached the same result regardless of whether or not the bank there customarily utilized a signed application. The court simply decided the case on the facts before it in reliance on *Hubbell* and *Sackett.* Thus, *Zwego,* fails to support the majority's conclusion. The majority's statement, slip op. at 5914, that "Sorensen's conviction must similarly be reversed because the government failed to produce evidence of a signed loan application containing false statements" is apparently in direct opposition to the *Zwego, Hubbell,* and *Sackett* precepts quoted above that both oral and written statements are covered by the statute and that it is not necessary that the false statement be an application in and of itself. I believe this unsupported statement by the majority leads them to an incorrect conclusion since neither the statute nor the cases require a signed loan application containing false statements.

Nor does *United States v. Jobe,* 101 F.3d 1046 (5th Cir.1996), cited by the majority, lend support to their position. Stanley Jobe was convicted of "making false statements on a loan application, in violation of 18 U.S.C. § 1014...." *Id.* at 1064. On appeal he argued insufficient evidence, and the court agreed:

> It is undisputed that Stanley made no direct representations concerning the loan. He was neither the borrower nor the payee of the proceeds, although he was a guarantor. Moreover, Stanley Jobe did not sign any loan application at CNB on May 18, 1990; in fact, there was no formal loan application whatsoever, but rather a loan presentation form

that was compiled by CNB employees and used by Sutton but unsigned by Stanley. At no time during the trial did the government introduce into evidence a loan application on which Stanley Jobe made a false statement.

*Id.* at 1064–65.

Stanley Jobe was charged with making a false statement on an application. He did not do it, and his conviction was properly reversed.

3. *The stipulation and the application.* Although in brief Sorensen conceded the existence of an "application" for purposes of his appeal, the majority finds there was no application because the Form 1003 was not signed by Sorensen. This leaves the panel deciding an issue that was neither briefed nor noticed for argument.

I am satisfied there was an application, both in fact and also within the meaning of the statute. Apparently the majority concedes this but for the "borrower's" signature. (It is worth noting that a broker would not normally sign for a borrower in any event.) The record does not establish that RTC was without power to fund unsigned loan applications. Rather, government counsel stated in oral argument that it is RTC's custom to process loans with unsigned application forms, only requiring signature at the time of closing when the note, security agreements, and other documents are signed. Clearly RTC treated and processed this unsigned 1003 as its application. The fact that the loan was never funded so the documents were never signed makes this 1003 no less an "application" within the meaning of the statute. (Certainly the loan need not be disbursed for there to be a violation of § 1014.) If the majority can accept *Zwego,* believing that *Zwego* brings oral applications within the purview of § 1014 where oral applications are customary, why isn't RTC's custom covered by the same reasoning?

At trial the government presented evidence as to RTC's practices. The trial court instructed the jury—consistent with

the statute—that the paper form need not be signed to constitute an application. The whole matter went to the jury, which held for the government and convicted Sorensen.

As a practical matter, it should be noted that proof of the false statements and proof of the application or loan is not an issue here. This was a sting operation involving about 50 brokers. The false statements are preserved both on the Form 1003 and on videotape.

*Conclusion:* Had Congress intended to require only a signed application it clearly would have so provided, but did not. I would affirm the district court, but if I could not do so on the record before the court I would order reargument of the case before this panel on whether there was an application within the meaning of the statute.