[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-10273

_____

4:17-cr-00010-MW-CAS-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

DARRYL A. WILLIAMS,

Defendant – Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(August 22, 2019)

Before ROSENBAUM, BRANCH, and HIGGINBOTHAM,* Circuit Judges.

PER CURIAM:

---

* Honorable Patrick E. Higginbotham, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation.

Darryl Williams appeals his convictions for a scheme to commit bank fraud and making a materially false statement to a financial institution. On appeal, Williams argues that the district court: (1) erred in denying his motion for a judgment of acquittal on Count 2 because his misrepresentations of employment and income were not "for the purpose of influencing" the lending decision; (2) erred in denying his motion for a judgment of acquittal on Counts 7, 9, and 10 because he never submitted a loan "application" under § 1014; (3) erred in denying his motion for a judgment of acquittal on Count 6 based on constructive amendment of the indictment, which he argues rendered the indictment invalid; (4) erred in granting the government's motion in limine and precluding him from introducing evidence and argument that his payment history rendered his false statements immaterial; and (5) abused its discretion in denying his request to require the jury to identify unanimously which false statement or statements supported each count of the indictment. For the following reasons, we affirm.

## I.

On February 7, 2017, a grand jury indicted Williams. Count 1 of Williams's indictment charged him with bank fraud, in violation of 18 U.S.C. § 1344,[1] and the

_____

[1] In its entirety, 18 U.S.C.A. § 1344 provides:

remaining counts of the ten-count indictment were for making materially false

statements to a financial institution in violation of 18 U.S.C. §§ 1014[2] and 2.[3] For

Counts 2, 6, 7, 9, and 10 (about which Williams makes specific arguments on

appeal), the indictment was based on the allegation that he had provided false

employment and income information in loan and credit applications he submitted

---

> Whoever knowingly executes, or attempts to execute, a scheme or artifice--
>
> > (1) to defraud a financial institution; or
> >
> > (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
>
> shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

The indictment referenced § 1344 generally, but the government proceeded under § 1344(2), not § 1344(1).

[2] In relevant part, 18 U.S.C.A. § 1014 criminalizes the conduct of "[w]hoever knowingly makes any false statement or report, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of . . . a Federal credit union . . . upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, loan, or insurance agreement or application for insurance or a guarantee, or any change or extension of any of the same."

[3] 18 U.S.C. § 2 provides:
> (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
>
> (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

Section 2 does not establish an independent offense, and "provides no penalty, but only abolishes the distinction between common law notions of 'principal' and 'accessory.'" *United States v. Kegler*, 724 F.2d 190, 200 (D.C. Cir. 1983).

3

to Envision Credit Union ("ECU"): Count 2 was for his false statement to obtain a "member Credit Application for $500"; Count 6 was for his false statement on his loan application for a $9,000 loan; Count 7 was for a false statement on his loan application for a $5,000 loan; Count 9 was for his false statement on a loan application for "an approximately $84,221 loan"; and Count 10 was for his false statement on an application for a $5,000 line of credit.

Before trial, the government filed a motion in limine to exclude evidence regarding Williams's good payment history as being irrelevant to any defense to 18 U.S.C. § 1344(2).

The government also filed a notice of error in the indictment, stating that there was a numerical error in Count 6 of the indictment. The government noted that Count 6 charged Williams with making false statements in a loan application submitted to ECU on or about July 10, 2012, for a $9,000 loan. The government explained that it expected to establish at trial that the loan application was made on or about July 10, 2012, but it was to request a loan of approximately $17,000, and was part of a series of related loan applications containing false statements that culminated in Williams submitting another loan application which ECU approved on or about August 3, 2012, for approximately $5,000. The government noted that

4

it provided the defense with discovery relating to these loan application documents on multiple occasions.

Williams filed a motion to dismiss Counts 2, 6, 7, 9, and 10. At the pre-trial hearing, the district court granted the government's motion in limine over Williams's objection, and denied Williams's motion to dismiss. The court stated that his objections to the sufficiency of the evidence and other arguments were defenses he could raise at trial. The court ruled that Williams could elicit some evidence regarding his timely payments on the loans, but expressly prohibited him from arguing that his payments constituted a defense to the charges.

At trial, the jury heard testimony from the FBI agent who interviewed Williams, as well as testimony from ECU employees. After the government rested, Williams moved for a judgment of acquittal as to Counts 2, 6, 7, 9, and 10. The court ultimately denied the motion, and the jury subsequently found Williams guilty on all counts. After Williams renewed his motion for a judgment of acquittal in writing, the court again denied the motion, noting that the arguments in the renewed motion were essentially the same as those raised at trial, and the motion was denied for the reasons previously stated on the record. The court sentenced Williams to one day of imprisonment, as to each count, concurrently, with credit for time served, and five years of supervised release. Williams timely appealed.

5

## II.

Williams challenges the district court's denial of his motion for judgment of acquittal on five grounds. He argues that the evidence at trial was legally insufficient to support the jury's verdict, that the Government's proof constructively amended the indictment, that the trial court should have allowed him to argue that he was not guilty on account of his timely payments on the loan, and that the jury instructions should have required unanimous agreement about which false statement or statements Williams had made in support of the loan applications.

"We review *de novo* the denial of a motion for judgment of acquittal, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences in favor of the jury's verdict." *United States v. Martin*, 803 F.3d 581, 587 (11th Cir. 2015). "The test for sufficiency of the evidence is identical, regardless of whether the evidence is direct or circumstantial, but if the government relied on circumstantial evidence, reasonable inferences, not mere speculation, must support the conviction." *Id.* (internal quotation marks omitted). The verdict must be affirmed unless there is no reasonable construction of the evidence from which the jury could have found the defendant guilty beyond a reasonable doubt. *Id.* at 1319–20. A jury is "free to choose among the reasonable

6

constructions of the evidence." *Id.* at 1320. It is therefore not necessary that the evidence "exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *Id.* Credibility determinations are left to the jury. *United States v. Flores,* 572 F.3d 1254, 1263 (11th Cir. 2009).

This Court reviews *de novo* whether a constructive amendment to an indictment occurred. *United States v. Gutierrez*, 745 F.3d 463, 473 (11th Cir. 2014).

Generally, when we review a district court's grant of a motion in limine, our standard of review is abuse of discretion. *United States v. Harrison*, 534 F.3d 1371, 1373 (11th Cir. 2008). When a district court rules on a motion in limine based on a conclusion of law, however, we review the court's legal conclusion *de novo. United States v. Thompson*, 25 F.3d 1558, 1563 (11th Cir. 1994). "If a defendant offers no relevant evidence to support a defense, the court may properly bar its presentation at trial." *United States v. Anton*, 546 F.3d 1355, 1357 (11th Cir. 2008).

"This court reviews a district court's rejection of a proposed jury instruction for abuse of discretion," and will reverse only if "left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations."

7

*Roberts & Schaefer Co. v. Hardaway Co.*, 152 F.3d 1283, 1295 (11th Cir. 1998) (quoting *Carter v. DecisionOne Corp.*, 122 F.3d 997, 1005 (11th Cir. 1997)). "We review the legal correctness of a jury instruction de novo." *United States v. Prather*, 205 F.3d 1265, 1270 (11th Cir. 2000).

**A. Count 2: Sufficiency of the Evidence**

First, Williams attacks his conviction on Count 2, under 18 U.S.C. §§ 1014 and 2, for false statements he made to obtain a $500 secured pledge loan, secured with his own funds, from ECU. Williams argues that a conviction requires the jury to find his false statements about his job and income were "for the purpose of influencing" the lending decision, *see* 18 U.S.C. § 1014, and that no reasonable jury could have found his statements were for that purpose because his misrepresentations about his income and employment were irrelevant to his qualification for a loan secured by his own funds. Thus, he argues, the statements could not have been made "for the purpose of influencing the lending decision."

Here, a reasonable jury could have decided that Williams made the false statements about his income for the purpose of influencing ECU's decision to approve the sought loan. As Williams himself told a federal agent, in a recorded interview played for the jury, he made the misrepresentation related to Count 2 because he thought he might not get the loan if he told the truth. In other words,

8

Williams made the misrepresentation for the purpose of influencing ECU's lending decision.

Further, and as Williams admits, an employee of ECU testified that the applicant's employment and income are still relevant to the lending decision. The ECU witness testified that he would not have approved a pledge loan for an applicant with no income, and that if he had known that Williams was unemployed at the time Williams applied for the pledge loan, ECU would not have given him the loan. Williams knew that the application asked for employment and income information, and his awareness of the content of the application also supported the jury's conclusion that he had the purpose of influencing ECU's lending decision when he gave false information. Because there is a reasonable construction of the evidence that supports a guilty verdict, the verdict must be affirmed. *See Godwin,* 765 F.3d at 1319–20.

## B. Counts 7, 9, & 10: Sufficiency of the Evidence

Next, Williams challenges the district court's denial of his motion for judgment of acquittal on Counts 7, 9, and 10, which were brought under 18 U.S.C. §§ 1014 and 2. With regard to Count 7, Williams applied for an increase in his ECU credit card limit by telephone, and ECU employees filled out the information on the form for him. Although the increase was approved, he never signed the loan

application, which was not prepared until after the loan was approved.[4] Similarly, regarding Count 9, Williams applied in person for a vehicle loan, and did not sign the resulting loan agreement. And for Count 10, Williams confirmed his employment and income information orally with ECU when he applied for a personal line of credit, but again did not sign the closing documents. Williams argues that he could not have made a false statement on a loan "application" within the meaning of 18 U.S.C. § 1014, since ECU would not have dispersed the loan until he signed the documents. Thus, he argues, because he never signed the loan documents that were required to disburse the loan or increase his credit limit, his misrepresentations at issue in Counts 7, 9, and 10 do not, on their own, violate § 1014.

We begin with the text of the statute. Section 1014 makes it a crime to "knowingly make[ ] any false statement . . . for the purpose of influencing in any way the action of . . . any institution [such as ECU] . . . upon any application . . . [or] loan." 18 U.S.C. § 1014. As we have previously observed, "Section 1014 is written in the disjunctive" and prohibits both "misstatements in an 'application . . .

---

[4] Although the briefing on this issue refers to Count 6, not Count 7, Williams filed a notice with this Court on April 3, 2019, clarifying that his motion on this ground pertained to Counts 7, 9, and 10. The trial transcript also reveals that he made the motion on this ground with respect to Count 7, not Count 6, and specifically referenced the testimony of Lori Halbert, who was the member service representative who spoke with Williams on the phone when he applied for the credit limit increase and provided false information; that conversation was the basis for Count 7.

*or* loan' (emphasis added), not merely an application *for* a loan." *United States v. Greene*, 862 F.2d 1512, 1514 n.2 (11th Cir. 1989).

We first turn to "any false statement." This language in § 1014 is very broad, and there is nothing in the text that allows us to read the statute as limited to "any false *written* statement." "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992); *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 388 (2013). We will not read into the statute a requirement that is not found in the text. *Cf. W. Union Tel. Co. v. State of Kansas ex rel. Coleman*, 216 U.S. 1, 44 (1910) ("We are not at liberty to read into the statute terms not found therein or necessarily implied . . . .").

We next turn to the term "upon any application." Here again the plain text of the statute is dispositive. The statutory language does not allow us to rewrite that phrase as "upon any *signed* application." And as the government points out, the application process at ECU is triggered whenever (and however) the potential borrower submits application information to the credit union. The plain language of § 1014 supports Williams's convictions for making false statements to influence ECU the moment he initiated the loan application process, orally or otherwise. Accordingly, we agree with those circuit courts that have found that "both oral and

11

written statements are covered by the statute," and "it is not necessary that the false statement be an 'application' in and of itself." *United States v. Zwego*, 657 F.2d 248, 250 (10th Cir. 1981).

This precise question—whether "any false statement . . . upon any application" in § 1014 includes unsigned forms like the ones involved in these counts—appears to be an issue of first impression in this Circuit. Other circuits have reached different results based on the particular facts of each case. The Second, Fifth, and Tenth Circuits have held that oral statements can constitute a violation of § 1014, and no formal signed application is necessary. *See United States v. Huntress*, 956 F.2d 1309, 1317–18 (5th Cir. 1992); *United States v. Zwego*, 657 F.2d 248, 249–50 (10th Cir. 1981); *United States v. Sackett*, 598 F.2d 739, 740–41 (2d Cir. 1979).

Williams, however, distinguishes those cases because each financial institution in question either did not enforce its policy requiring a signed form to approve or disburse the loan or did not have such a policy in the first place. He instead relies on the Ninth Circuit's decision in *United States v. Sorensen*, 179 F.3d 823 (9th Cir. 1999), in which the court held that false statements on an unsigned loan application form were not sufficient to meet the elements of § 1014 if the policies of the financial institution require a signature before making the lending

12

decision. *Id.* at 825–26. In that case, the court concluded that the government had not established that the defendant made false statements for the purpose of influencing the action of the bank "upon any application," as required by § 1014. *Id.*

To the extent *Sorensen* held that a violation of § 1014 can only occur if the defendant has completed all steps necessary for the financial institution to approve and disburse the loan, we disagree with that decision. We note, however, that *Sorensen* was explicitly narrow in its holding and looked to the financial institution's definition of "application" to determine if the conduct in question met the elements of § 1014. *See Sorensen*, 179 F.3d at 826 n.4 ("[W]e are *not* holding that the making of false statements on an unsigned application can *never* violate section 1014. . . . The lack of a signature is relevant in this particular case because the [financial institution in question] defines an application as a signed form.").

Accordingly, we affirm Williams's convictions on Counts 7, 9, and 10 on this ground.

## C. Count 6: Constructive Amendment of the Indictment

Williams also argues that the government constructively amended its indictment with respect to Count 6, which charged him with violating 18 U.S.C. §§ 1014 and 2, and that the court should have granted his motion for a judgment of

acquittal on that count. Before trial, the government notified Williams and the court that there was a numerical error in Count 6 of the indictment. While the indictment alleged that the false statements charged in that count had been in support of a July 10, 2012 application for a $9,000 loan, the loan application made on that date was actually for "a loan of approximately $17,000." The government explained that the application was "part of a series of related loan applications containing false statements that culminated in the defendant" submitting an application on or about August 3, 2012 for about $5,188.67, which the bank approved. Williams argues that the different date and amount of the loan constitute an entirely distinct offense. The government argues that Williams still made an "application" for a loan on August 10, whether or not the loan was consummated on that date, and that the amount of the request was immaterial. Thus, the government says, no element of the offense was broadened by the correction, and the variance from the indictment was harmless.

When the trial court permits a deviation from the indictment, the following issue arises:

> A fundamental principle stemming from [the Fifth Amendment] is that a defendant can only be convicted for a crime charged in the indictment. It would be fundamentally unfair to convict a defendant on charges of which he had no notice. Two types of problems can arise as a result of a trial court's deviation from an indictment. When a defendant is convicted of charges not included in the indictment, an amendment of

14

the indictment has occurred. If, however, the evidence produced at trial differs from what is alleged in the indictment, then a variance has occurred. The distinction between an amendment and a variance is important in that an amendment is *per se* reversible error, while a variance requires the defendant to show that his rights were substantially prejudiced by the variance in order to be entitled to a reversal.

*United States v. Keller*, 916 F.2d 628, 633 (11th Cir. 1990). "[T]he proper distinction between an amendment and a variance is that an amendment occurs when the essential elements of the offense contained in the indictment are altered to broaden the possible bases for conviction beyond what is contained in the indictment." *Id.* at 634. In contrast, "[a] variance occurs when the facts proved at trial deviate from the facts contained in the indictment but the essential elements of the offense are the same." *Id.* Thus, we must determine whether the deviation at issue here is either a constructive amendment or a variance. If it is a constructive amendment, we must reverse. Otherwise, we must determine "(1) whether a material variance did indeed occur; and (2) whether the appellants suffered substantial prejudice as a result of the variance." *United States v. Champion*, 813 F.2d 1154, 1166 (11th Cir. 1987).

Section 1014 requires evidence that a defendant (1) knowingly (2) made a false statement or report (3) for the purpose of influencing the action of a financial institution upon any application. *See* 18 U.S.C. § 1014; *Williams v. United States*,

15

458 U.S. 279, 284 (1982). The government argues that it did not change the date of the offense from what was charged in the indictment. We agree. As we observed in the preceding section, Williams's false representations in support of a loan application on July 10 violated the plain language of the statute whether or not he signed the bank's form on that date.[5] As for the dollar amount of the loan involved, the statute contains no monetary amount requirement, so the amount of the alleged fraud is not an essential element of the offense. As long as the indictment contained the essential elements of the crime charged, the particular offense conduct of which the defendant was convicted is identifiable, and the defendant was not prejudiced by the deviation from the indictment, no constructive amendment occurred, and therefore there is no per se reversible error. *Cf. United States v. Narog*, 372 F.3d 1243, 1247–48 (11th Cir. 2004) (finding constructive amendment due to a broadening of the possible bases for conviction). Thus, the district court was correct in concluding that the changes did not constitute a constructive amendment.

We then turn to the question of whether a material variance occurred, and whether Williams "suffered substantial prejudice as a result." *Champion*, 813 F.2d

---

[5] We also note the date of the conduct is not an essential element of the offense. *Cf. Champion*, 813 F.2d at 1168 (treating a change of date as a potential variance but holding that "[w]hen the prosecution uses the 'on or about' designation, proof of a date reasonably near to the specified date is sufficient.").

16

at 1166. Where a deviation from the indictment does not result in prejudice, we do not have to consider materiality. In *Champion*, we determined that a deviation from the indictment is immaterial if it does not prejudice the defendant's substantial rights. *Champion*, 813 F.2d 1154, 1168 (11th Cir. 1987) ("Any variance in this case is therefore immaterial because [the defendant] has failed to demonstrate any prejudice to his substantial rights."). Prejudice occurs "where the proof at trial differed so greatly from the charges in the indictment that the defendant was unfairly surprised and had an inadequate opportunity to prepare a defense." *United States v. Caporale*, 806 F.2d 1487, 1500 (11th Cir. 1986) (citations omitted); *see also United States v. Reed*, 887 F.2d 1398, 1403 (11th Cir. 1989) ("There is nothing to indicate that differences between the dates in the indictment and the notice of the charges undermined Appellant's right to proper notice of the charge or exposed him to the danger of a second prosecution for the same offense.").[6]

Even if Williams is correct that there was a deviation from the indictment in the date of the alleged offense and amount of the loan at issue, he has suffered no prejudice. Because discovery regarding the entire sequence of events relating to

---

[6] *Caporale* holds that prejudice can also occur "where there are so many defendants and so many separate conspiracies before the jury that there is a substantial likelihood that the jury would transfer evidence from one conspiracy to a defendant involved in another conspiracy," but that circumstance is not applicable here. *Caporale*, 806 F.2d at 1500.

17

Count 6 was provided and labeled as relating to Count 6, and because there was no confusion as to which initial loan application was at issue, Williams has not shown that he "was unfairly surprised and had an inadequate opportunity to prepare a defense" due to any variance in the date or monetary amount proved at trial. *Caporale*, 806 F.2d at 1500; see also *Reed*, 887 F.2d at 1403 ("Ordinarily, a variance between the date alleged and the date proved will not trigger reversal as long as the date proved falls within the statute of limitations and before the return of the indictment.").

Thus, the district court did not err in denying the motion for a judgment of acquittal on this ground.

### D. Exclusion of Williams's Arguments Regarding Payments on Loans

With regard to Count 1, which charged Williams with violating 18 U.S.C. § 1344(2), Williams argues that the district court erred by precluding him from arguing that his good payment history was a defense to the charge. Specifically, he asserts that he should have been allowed to argue that he did not "obtain [the loans] by means of false or fraudulent pretenses" under the statute because his prior good payment history, and not his false statements, was the "mechanism naturally inducing" ECU's decision to approve the loans. *See Loughrin v. United States*, 573 U.S. 351, 363 (2014).

18

18 U.S.C. § 1344(2) makes it a crime to "knowingly execute[], or attempt[] to execute, a scheme or artifice . . . to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises." As an initial matter, unlike § 1344(1), the plain language of § 1334(2) does not require an intent to defraud; rather it requires that a defendant obtain bank property "by means of" a misrepresentation. *Loughrin*, 573 U.S. at 353 ("The question presented is whether the Government must prove that a defendant charged with violating [18 U.S.C. § 1344(2)] intended to defraud a bank. We hold that the Government need not make that showing."). Section 1334(2) simply requires that the defendant acquire bank property "by means of" a misrepresentation. *Id.* at 362–63. The "by means of" phrase "typically indicates that the given result ('the end') be achieved, at least in part, through the specified action, instrument, or method ('the means'), such that the connection between the two is more than oblique, indirect, or incidental." *Id.* at 363. Section 1344(2)'s "by means of" language is satisfied when the defendant's false statement is the "mechanism naturally inducing" a bank to part with money in its control. *Id.*

Williams argues that the district court improperly prohibited him from arguing that his good payment history, and not his false statements, was the

19

"mechanism naturally inducing" the loan approval. He misconstrues the district court's decision. The record does not indicate that the district court precluded Williams from arguing that his prior payment history was the impetus for granting the loans, rendering his false statements about his employment and income immaterial. In fact, the district court explicitly allowed Williams to talk about how ECU made its lending decisions, stating that "you can certainly talk about the process [of making loans] and you can cross-examine them about the process." And Williams admits that the court allowed him to present evidence of his good loan payment history at trial.

Instead, the district court correctly excluded the argument that by paying off the loans *after* they were granted, Williams lacked intent to defraud ECU when he acquired the loans. As intent to defraud is not an element of 18 U.S.C. § 1344(2), it is not a permissible defense. *Loughrin*, 573 U.S. at 353. Thus, it would have been legally improper for Williams to raise his subsequent repayment of the loans as a defense to the false statement charges. Moreover, to the extent that Williams contends that he should have been allowed to argue that he was not guilty because ECU had relied on his payment history rather than his false statements in making its lending decisions, the district court also would have been correct to exclude that argument. As we have previously held, the financial institution's actual reliance on

20

the false representations is not necessary to make those statements material. *United States v. Gregg*, 179 F.3d 1312, 1315 (11th Cir. 1999). Accordingly, we affirm the district court's grant of the government's motion in limine.

## E. Jury Instructions

As a final matter, Williams argues that for all counts the district court's jury instructions should have required the jury to make a unanimous finding on the precise false representation that gave rise to the findings of guilt under 18 U.S.C. §§ 1344(2), 1014. Specifically, he argues that under § 1014 the element "makes any false statement or report" can be "categorized as 'any false representation,'" so the jury should have been required to agree unanimously on which of the alleged representations (i.e., name of employer, dates of employment, or income) constituted the false representation. Similarly, Williams argues that the phrase "by means of false or fraudulent pretenses, representations, or promises" in § 1344(2) requires the jury to agree unanimously as to which false representation constituted that element of the crime. In response, the government argues that the jury was required to determine unanimously only that Williams made some false statement with the requisite knowledge; that is, there was no requirement that the jurors agree unanimously to the specific falsehood.

21

Williams's proposed jury instruction for Count 1 read "You must be unanimous as to the false representation or representations [that] constituted the scheme to obtain money[ies] or funds" (second alteration in original). **[Doc. 63]**. For the remaining counts, his proposal would have instructed the jury that "You must be unanimous as to the false statement the defendant made." His proposed verdict form would have required the jury to select which of employment status, employer, length of employment, or salary constituted the false representation for Count 1, and which of employer, length of employment, and income constituted the false representation for each of the remaining counts.

Williams relies on *United States v. Gipson*, 553 F.2d 453, 458–59 (5th Cir. 1977), in which the former Fifth Circuit concluded that the defendant's right to a unanimous verdict was infringed. In its analysis, the six prohibited acts listed in 18 U.S.C. § 2313 (sale or receipt of stolen vehicles) fell into two distinct conceptual groupings. The court held that the two groupings were sufficiently different that a jury finding of the *actus reus* element of the offense would not be unanimous if some of the jurors thought the defendant committed only an act in the first group, while others thought he committed only an act in the second group. *See id.* at 458–59.

22

The Supreme Court declined to endorse *Gipson*'s method in *Schad v. Arizona*, 501 U.S. 624, 635 (1991), because the approach, which utilized "distinct conceptual groupings," was "too indeterminate to provide concrete guidance to courts faced with verdict specificity questions." *See also United States v. Verbitskaya*, 406 F.3d 1324, 1334 (11th Cir. 2005) (noting that *Schad* "discredited" *Gipson*).

In *Richardson v. United States*, 526 U.S. 813 (1999), the Supreme Court offered further guidance on what a jury must determine unanimously. There, the Supreme Court was faced with a continuing criminal enterprise statute (21 U.S.C. § 848(a)) that required the government to prove a "series of violations." The question before the Court was whether the term "series of violations" refers to a single element or several elements. Specifically, if the term constitutes a single element, the jury need only agree that the defendant committed at least three of the underlying crimes, but need not agree on which three he committed. In contrast, if each violation in the series is an element of the crime, the jury must agree unanimously as to which three crimes he committed. *Richardson*, 526 U.S. at 818.

The Court in *Richardson* determined that each "violation" in the list was an element of the crime, and thus the jury must be unanimous when deciding which violations the defendant committed. *Id.* at 824. But the Court reiterated that "a

23

federal jury need not always decide unanimously which of several possible sets of

underlying brute facts make up a particular element, say, which of several possible

means the defendant used to commit an element of the crime." *Id.* at 817. The

Court continued:

> Where, for example, an element of robbery is force or the threat of
> force, some jurors might conclude that the defendant used a knife to
> create the threat; others might conclude he used a gun. But that
> disagreement—a disagreement about means—would not matter as long
> as all 12 jurors unanimously concluded that the Government had proved
> the necessary related element, namely, that the defendant had
> threatened force.

*Id.* at 817.[7] Simply put, although a jury must decide unanimously that the

government has proved each element of a crime, it need not agree unanimously as

to which of several means the defendant used to commit each element. *Id.*

Here, the district court instructed the jury that a conviction on Count One

required them to determine unanimously that Williams "knowingly carried out or

attempted to carry out a scheme to get money" from ECU "by means of false or

fraudulent pretenses, representations, or promises about a material fact." As with

the hypothetical knife or gun as "means" of threat of force contemplated in

---

[7] Thereafter, we addressed whether a jury was required to agree unanimously on the theory of how an extortion affected interstate commerce in convicting a defendant under the Hobbs Act. *Verbitskaya*, 406 F.3d at 1328, 1334. Addressing the defendant's reliance on *Gipson*, we concluded that *Gipson* was discredited by the Supreme Court's decision in *Schad*, and therefore, the district court did not need to instruct the jury to agree unanimously on which theory supported the verdict. *Id.* at 1334.

24

*Richardson*, 526 U.S. at 817, Williams's statements regarding his income, his employer, and his length of employment were the possible "means" that the government submitted to prove the element of a false representation. The jury was not required to agree unanimously as to which of these factors constituted the false representation the government had to prove, as long as the jury unanimously concluded that Williams had made a false representation. *See id.*

Similarly, the district court instructed the jury that Williams could be found guilty of each of the remaining counts only if they unanimously agreed that he "made a false statement or report" and "did so knowingly and with intent to influence an action of" ECU regarding an application. Once again, Williams's statements regarding his income, his employer, and his length of employment were each possible "means" of making a false statement or report, so the jury was not required to decide unanimously as to which statement was false. Instead, they only had to agree that he committed that element of the crime—making a false statement. *See Richardson*, 526 U.S. at 817.

Thus, the district court did not abuse its discretion in denying Williams's request for a jury instruction requiring unanimity on the specific false statement relevant to each count.

25

## III.

Because we conclude that the district court did not err, we affirm Williams's convictions.

**AFFIRMED**.